**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF TENNESSEE, *ex rel*. PAMELA ANDERSON<br><br>Plaintiffs,<br><br>vs.<br><br>GRACE HEALTHCARE LLC, GRACE ANCILLARY SERVICES LLC; KINDRED HEALTHCARE, INC. d/b/a REHABCARE, WELSH-BELLO REHAB MANAGEMENT CONSULTING LLC, and EVERGREEN REHABILITATION LLC<br><br>Defendants. | Civil Action No. _________<br><br>**FILED UNDER SEAL**<br>**Pursuant to 31 U.S.C. § 3730(b)(2)** |

**COMPLAINT**

*Qui tam* relator Pamela Anderson brings this action under the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq*. ("FCA") on behalf of the United States of America and under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*. ("Tennessee MFCA") on behalf of the State of Tennessee against Defendants Grace Healthcare LLC; Grace Ancillary Services LLC; Welsh-Bello Rehab Management Consulting LLC; Kindred Healthcare, Inc. (doing business as Rehabcare), and Evergreen Rehabilitation LLC (collectively "Defendants"). Relator's allegations are based upon her knowledge and upon an investigation undertaken by her through counsel.

**NATURE OF THE CASE**

1. This *qui tam* action is an effort to restore to the United States millions of dollars Defendants have taken through a systemic and longstanding fraud, perpetrated through Medicare Parts A and B and through Medicaid.

2. Medicare and Medicaid reimburse providers of physical, speech, and/or occupational therapy only to the extent that such therapy is medically necessary. Therapy is not medically necessary where a patient cannot benefit from it, for example because the patient's condition is such that they will never improve regardless of how much therapy is performed.

3. Defendants implemented a system whereby therapists are directed to: (1) create plans of care for patients at the highest levels possible without any regard to whether patients the patients needed or were benefitting from that therapy, (2) submit claims for therapy services not provided, and (3) continue to provide therapy services to patients for whom therapy is no longer medically necessary instead of discharging these patients. As a result, Defendants caused skilled nursing facilities such as those operated by Defendant Grace to submit false claims to Medicare and Medicaid.

4. This scheme has gone on for years and, on information and belief, continues to this day.

## **JURISDICTION AND VENUE**

5. Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA.

6. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.

7. This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants transacted business and committed violations of 31 U.S.C. § 3729 in this District.

8. This action is not based upon prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a

party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

9. To the extent there has been a public disclosure unknown to Relator, she is an original source under all relevant statutory provisions. Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which her allegations are based and/or has knowledge that is independent of, and materially adds to, the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

## PARTIES

10. Defendant Grace Healthcare LLC ("Grace") is a limited liability corporation organized and existing under the laws of the state of Delaware with its headquarters and principal place of business located at 7201 Shallowford Road, Suite 200, Chattanooga, Tennessee. Grace owns and operates skilled nursing, assisted living, and rehabilitation facilities in locations throughout the United States, including in this District. Grace is affiliated with Grace Ancillary Services LLC, which is a Delaware limited liability corporation providing physical, occupational, and speech language therapy services to the skilled nursing homes owned and managed by Grace, including the Soddy Daisy Healthcare Center, where Grace Ancillary Services hired Relator to work as a physical therapist assistant.

11. Defendant Kindred Healthcare, Inc., doing business as Rehabcare ("Rehabcare"), is a corporation organized and existing under the laws of the state of Delaware with its principal place of business located at 680 South 4th Street, Louisville, Kentucky. Kindred Healthcare acquired Rehabcare Group, Inc. and its subsidiaries in June of 2011. Prior to June of 2011, Rehabcare Group, Inc. had been a publicly-traded Delaware corporation that provided and

managed therapy services at skilled nursing facilities ("SNFs"), long term care facilities, and hospitals nationwide. Since its acquisition, Rehabcare has been the rehabilitation division of Kindred Healthcare, providing physical, occupational, and speech language therapy services to SNFs such as those operated by Grace.

12. Defendant Welsh-Bello Rehab Management Consulting LLC is a limited liability corporation organized and existing under the laws of the state of Tennessee with its principal place of business located at 129 Walnut Street, Unit 223, Chattanooga, Tennessee. Welsh Bello's "single focus" is "creating highly sophisticated, clinically exceptional and profitable rehabilitation programs for a select range of skilled nursing facilities throughout the U.S." such as those operated by Grace. *See* http://www.welshbello.com/WBHomePage.php.

13. Defendant Evergreen Rehabilitation LLC is a limited liability corporation organized and existing under the laws of the state of West Virginia with its headquarters and principal place of business located at 136 St. Matthews Avenue, Louisville, KY 40207. Evergreen is a rehabilitation provider "contracted to manage day-to-day operations and therapy staffing for rehabilitation programs that serve long-term care communities" such as those operated by Grace. *See* http://www.evergreenrehab.com/about.

14. Relator Pamela Anderson is a natural person residing in the state of Tennessee. Ms. Anderson has been a physical therapist assistant for 25 years. Ms. Anderson was employed by Grace Ancillary Services to work at Grace-managed Soddy Daisy Healthcare Center in Soddy Daisy, Tennessee from April 6, 2009 until her termination on August 31, 2014. Ms. Anderson reported to, and received orders regarding her therapy caseload from, rehabilitation managers employed by Welsh-Bello and Rehabcare. Through her employment at the Soddy Daisy facility, Ms. Anderson gained first-hand knowledge of the fraud described herein.

15. The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein -- Medicare claims in full and Medicaid claims in part -- and is entitled to the bulk of the recovery sought by this action. Medicare is a federal health insurance program administered by CMS for the elderly and disabled. *See* 42 U.S.C. §§ 1395-1395hhh. Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients. *See* 42 U.S.C. §§ 1396-1396v.

16. The State of Tennessee is a real party in interest under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181, *et seq*., and ultimately paid a portion of the false Medicaid claims alleged herein. See 42 U.S.C. §§ 1396-1396v.

## RELEVANT STATUTES AND REGULATIONS

### I. THE FEDERAL AND TENNESSEE FALSE CLAIMS ACTS

17. The FCA prohibits several variations of fraud on the government. Among other things, the statute creates liability for:

a. knowingly presenting, and causing to be presented, to an officer and employee of the United States Government a false and fraudulent claims for payment and approval (31 U.S.C. § 3729(a)(1)(A));

b. knowingly making, using, and causing to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government (31 U.S.C. § 3729(a)(1)(B));

c. conspiring to commit the foregoing violations against the United States Government (31 U.S.C. § 3729(a)(1)(C));

d. knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government (31 U.S.C. § 3729(a)(1)(G)).

18. The Tennessee MFCA likewise prohibits presenting false claims, using false records or statements to get false claims paid, conspiring to defraud Medicaid by getting false claims paid, or using false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee. Tenn. Code Ann. § 71-5-182(a)(1)(A)-(D) (2012).

19. The FCA and the Tennessee MFCA define "knowingly" as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information…." 31 U.S.C. § 3729(b)(1); Tenn. Code Ann. § 71-5-182(b) (2012).

20. The FCA and the Tennessee MFCA define "material" to mean having "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4); Tenn. Code Ann. § 71-5-182(e) (2012).

## II. MEDICARE, MEDICAID AND OTHER GOVERNMENT-FUNDED HEALTHCARE PROGRAMS

21. The Medicare program was established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395 *et. seq*. Medicare Part A authorizes the payment of federal funds for hospitalization and post-hospitalization care, to include care in SNFs. Medicare Part A

provides coverage for up to 100 days for skilled therapy services provided for inpatients in SNFs. 42 C.F.R. § 409.61(b).

22. Medicare Part B authorizes the payment of federal funds for medical and other health services that are not covered by Part A, including, without limitation, physician services, laboratory services, outpatient therapy, diagnostic services and radiology services.

23. Medicare Part B also pays for certain services furnished to inpatients who either are not entitled to benefits under Part A or have exhausted their Part A benefit but are entitled to benefits under Part B of the program.

24. The Secretary of HHS administers the Medicare Program through the Centers for Medicare and Medicaid Services (CMS). CMS contracts with private insurance companies to process claims. Part A reimbursement is processed through private companies called fiscal intermediaries. Part B reimbursement is processed through Medicare carriers.

25. Medicare enters into provider agreements with providers and suppliers to establish their eligibility to participate in the program. To be eligible for payment under the program, providers and suppliers must certify compliance with the applicable Medicare laws, regulations and program instructions. Every facility with which Welsh-Bello, Rehabcare, and Evergreen contracts must make and comply with this certification in order to be eligible to submit claims to Medicare.

26. Providers may only receive Medicare reimbursement for those health care services that are reasonable and necessary. *See* 42 U.S.C. § 1862(a)(1)(A).

27. The Medicaid program was also created in 1965 as part of the Social Security Act, which authorized federal grants to states for medical assistance to low-income persons, blind, disabled, or members of families with dependent children or qualified pregnant women or

children. The Medicaid program is jointly financed by the federal and state governments. CMS administers Medicaid on the federal level. Within broad federal rules, each state decides eligible groups, types and range of services, payment levels for services, and administrative and operating procedures. The states directly pay providers, with the states obtaining the federal share of the payment from accounts which draw on the United States Treasury. 42 C.F.R. §§ 430.0-430.30. The federal share of Medicaid expenditures varies by state.

28. Other federally-funded medical coverage programs exist to insure defined populations of enrollees, including the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), TRICARE, and the Veterans Administration, among others.

29. Reimbursement practices under all federal-funded healthcare programs closely align with the rules and regulations governing Medicare reimbursement.

## III. CONDITIONS OF PAYMENT FOR MEDICARE PAYMENTS TO SKILLED NURSING FACILITIES FOR THERAPY SERVICES

30. Skilled therapy services must satisfy several conditions of payment to be reimbursed by Medicare and Medicaid and other government programs. First, the therapy services must be "skilled rehabilitation services," that is, services that are so inherently complex that they must be supervised by skilled medical personnel. Ctr. for Medicare and Medicaid Servs., Medicare Benefit Policy Manual, CMS Pub. 100-02, ("Medicare Benefit Policy Manual") Ch. 8, Secs. 30, 30.2-30.4; *accord* 42 C.F.R. §§ 409.17, 409.32.

31. Second, therapy services must be medically necessary. Medicare Benefit Policy Manual, Ch. 8, Sec. 30; *accord* 42 C.F.R. § 410.12; 42 C.F.R. § 424.24. Skilled therapy is medically necessary when it is: (1) a specific and effective treatment for the beneficiary's condition under accepted standards of medical practice; (2) a treatment that constitutes physical therapy that can only be safely and effectively performed by, or under the supervision of, a

qualified physical therapist; (3) based on an expectation that the patient's condition will improve significantly in a reasonable period of time; and (4) of an amount, frequency, and duration that is reasonable. Medicare Benefit Policy Manual, Ch. 8, Sec. 30.4.1.1. Therapy that is not medically necessary is not reimbursable.

32. Third, therapy must be provided pursuant to a written "plan of treatment" created either by the beneficiary's physician, licensed therapist or other individual authorized by Medicare regulations. 42 C.F.R. § 409.17. This plan of treatment is often referred to as a "Plan of Care."

33. Fourth, the plan must be established before treatment begins by one of the following: (1) a physician; (2) nurse practitioner, a clinical nurse specialist or a physician assistant; (3) the physical therapist furnishing the physical therapy services; (4) speech-language pathologist furnishing the speech-language pathology services; or (5) an occupational therapist furnishing the occupational therapy services. 42 C.F.R. § 409.17(b).

34. Finally, the plan must: (1) prescribe the type, amount, frequency, and duration of the physical therapy, occupational therapy, or speech-language pathology services to be furnished to the individual; and (2) indicate the diagnosis and anticipated goals. 42 C.F.R. § 409.17(c).

### A. <u>Reimbursement under Medicare Part A</u>

35. Medicare Part A is hospital insurance that helps cover certain types of care provided by institutional providers within specified limits, including physical, occupational, and speech therapy provided on an inpatient basis at SNFs. *See* 42 U.S.C. § 1395c.

36. Medicare Part A is a prospective payment system ("PPS") that reimburses, among other things, SNFs for post-hospital physical, occupational, and speech therapy provided on an

inpatient basis. 42 C.F.R. § 409.20. Specifically, Medicare Part A reimburses SNFs on a *per diem* basis for each patient who receives skilled nursing services from a SNF.

37. To receive Part A coverage for SNF care, beneficiaries must continue to meet regular eligibility requirements which include: (1) the beneficiary must have been a hospital inpatient for a medically necessary stay of at least three consecutive calendar days; (2) the beneficiary must have been transferred to a SNF that signed a participating agreement with CMS within 30 days after discharge from a hospital; and the beneficiary must require daily skilled nursing or rehabilitation services. 42 U.S.C. § 1395x(i).

38. For Part A beneficiaries, the SNF submits claims for therapy services as part of the Part A claims for the *per diem* amount assigned to that beneficiary. The rate of reimbursement for each of these patients is largely determined by that patient's Resource Utilization Group ("RUG") score. Generally speaking, the PPS *per diem* for each RUG is established based on payments made by the SNF for allowable costs under Part A and Part B during applicable cost reporting periods. Such allowable costs include, among other things, the cost of skilled therapy services. The more therapy a patient requires, the higher that patient's RUG score will be and, accordingly, the more money Medicare will provide the SNF to reimburse it for patient care. *See generally* 42 C.F.R. §§ 413.330, 413.335, 413.337.

39. Patients who are similarly situated and who will therefore require similar care are assigned to the same RUG category and are reimbursed at a similar rate. The current version of RUG classifications is RUG-IV.

40. Medicare requires SNFs periodically to assess each patient's clinical condition, functional status, and expected and actual use of services. The results of these periodic assessments are reported on a form via a standardized tool known as the Minimum Data Set

("MDS"). Ctr. for Medicare and Medicaid Servs., Long-Term Care Facility Resident Assessment Instrument User's Manual ("RAI Manual"), (Version 3.0), Ch. 1 at 1-6.[1] The MDS is used as the basis for determining a patient's RUG level and, in turn, the *per diem* amount that Medicare will pay a SNF to provide skilled nursing and therapy to that patient.

41. SNFs must perform patient assessments and include the results on an MDS form on the 5th, 14th, 30th, 60th, and 90th day of the patient's Medicare Part A stay in the facility. 42 C.F.R. § 413.343(b); RAI Manual, Ch. 2 at 2-12. The date the SNFs performs the assessment is known as the assessment reference date. RAI Manual, Ch. 2 at 2-8. SNFs may perform the assessment within a window of time before this date, or, under certain circumstances, up to five days after. When a SNF performs its assessment (except for the first assessment), it looks at the patient for the seven days preceding the assessment reference date. As discussed above, this seven day assessment period is referred to as the "look-back period." *Id.*

42. The MDS collects clinical information on over a dozen criteria, including hearing, speech, and vision; cognitive patterns; health conditions; and nutritional and dental status. Section O of the MDS ("Special Treatments and Procedures") collects information on how much and what kind of skilled rehabilitation therapy the facility provided to a patient during the look-back period. RAI Manual, Ch. 3 at O-15-O16. In particular, Section O instructs the SNF on how to properly record the number of days and minutes of therapy the SNF provided to a patient in each therapy discipline (*i.e.*, physical therapy, occupational therapy, and speech-language pathology and audiology services). *Id.* at O-15-O35. As discussed below, the information contained in Section O directly impacts the rehabilitation RUG level to which a patient will be assigned.

[1] Version 3.0 of the RAI manual took effect on October 1, 2010.

43. A patient's RUG score is based on the amount of therapy assigned by appropriate personnel (as set forth in 42 C.F.R. § 409.17(b)) during an initial assessment period. During this period, the appropriate personnel evaluate the level of skilled therapy the patient requires and document the total minutes of all therapy provided. RAI Manual, Ch. 6 at 6-26-6-29.

44. On the basis of the initial or subsequent assessment, a beneficiary is assigned to a RUG category. The number of therapy minutes documented during the initial or subsequent assessment period is included in the reimbursement for that RUG category. *Id.*

45. Assigning a Medicare beneficiary to one of the RUGs is based on the number of therapy (physical, occupational, or speech) minutes that the patient has used or is expected to use; the need for certain services (*e.g.*, respiratory therapy or specialized feeding); the presence of certain conditions (*e.g.*, pneumonia or dehydration); an index based on the patient's ability to perform independently four activities of daily living (*e.g.*, eating, toileting, bed mobility and transferring); and in some cases, signs of depression. RAI Manual, Ch. 6 at 6-3-6-5. Patients' characteristics and service use are determined by periodic assessments using the MDS.

46. CMS made various changes to the RUG-III structure through its RUG-IV classification system, which took effect October 1, 2010. CMS initiated a national project to create an updated MDS (Version 3.0) to improve the clinical relevance and accuracy of MDS assessments. CMS added new clinical RUG categories, modified the time frame in which each assessment must be performed, required that facilities assess changes in the level of therapy every seven days, and revised certain rules to group therapy, among other changes. *See* Medicare Program: Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2010; Minimum Data Set, Version 3.0 for Skilled Nursing Facilities

and Medicaid Nursing Facilities, 74 Fed. Reg. 40288, 40386 (August 11, 2009) (amending 42 C.F.R. § 483).

47. There are five basic RUG classifications delineated by, *inter alia*, the minimum amount of therapy minutes required for a patient to achieve the expected therapeutic result. The classifications are: Ultra High (a minimum of 720 minutes per week), Very High (500-719 minutes per week), High (325-499 minutes per week), Medium (150-324 minutes per week), and Low (45-149 minutes per week). Medicare Program: Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2010; Minimum Data Set, Version 3.0 for Skilled Nursing Facilities and Medicaid Nursing Facilities, 74 Fed. Reg. 40288, 40386. The highest daily rate Medicare will pay a SNF is for the Ultra High level of skilled therapy, which is reserved for only the most clinically complex patients who require skilled therapy services well beyond the average patient.

48. Under the revised regulations, CMS changed the rules for concurrent therapy by apportioning payment among patients treated concurrently and by counting as "treatment" minutes only the apportioned therapist time rather than the actual number of therapy minutes provided to patients. These changed rules should have resulted in an overall increase of patients assigned to lower RUG categories with lower payment levels.[2] *Id.*

49. Further revisions to CMS's regulations also required SNFs to complete a Change of Therapy ("COT") Other Medicare Required Assessment ("OMRA") when the amount of therapy provided to a SNF inpatient no longer reflected the initial RUG category assignment and

[2] As CMS explained: "[w]e are aware, however, that by allocating concurrent therapy minutes to assign the RUG–IV category, the total number of therapist staff minutes may not be sufficient to keep a patient in the same therapy group for payment purposes." *Id.* at 40316.

an End of Therapy with Resumption OMRA must be completed when therapy has been discontinued for three consecutive days. These regulations went into effect on October 1, 2011. Medicare Program: Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2012, 76 Fed. Reg. 48486 (August 8, 2011) (amending 42 C.F.R. § 413).

50. The structure of the RUG groups and daily PPS rate is adjusted periodically. The RUG-III classification was in place from January 1, 2006 through October 1, 2010. The RUG-IV classification system has been in effect from October 1, 2010 through the present. Medicare Program: Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2010; Minimum Data Set, Version 3.0 for Skilled Nursing Facilities and Medicaid Nursing Facilities, 74 Fed. Reg. 40288.

51. Each RUG score is also impacted by a patient's capacity to perform activities of daily living ("ADL") such as toileting, eating, transfers and mobility (known as the "late loss" ADLs). The ADL categories reflect the amount of assistance a patient typically needs throughout the day -- for example, whether a patient is totally bed-ridden, needs assistance eating or using the toilet, and so forth.

52. A patient's ADL score indicates the level of functional assistance or support the patient requires. CMS RAI Manual Ch. 6 at 6-25. A patient's total RUG IV-ADL score is the combination of scores for "self-performance" (*i.e.* what activities the patient actually completed within the ADL category in the prior seven days) and "support" (*i.e.* the most support SNF staff provided to the patient in the prior seven days) for each of the four "late loss" ADLs. *Id.* The total ADL scores range from 0-16, with the higher numbers indicating greater patient dependency. *Id.*

53. The amount of therapy a patient requires and the patient's total ADL score combine to form the patient's RUG score.

**B. Reimbursement under Medicare Part B**

54. Medicare Part B is a per-service payment system that reimburses, among other things, SNFs for therapy provided on an out-patient basis, or, in some instances, for therapy provided on an in-patient basis to individuals whose Part A coverage has been expended. The criteria for coverage of services are the same under Part B as it is under Part A.

55. In the SNF setting, Part B reimburses the SNF for therapy services provided to patients after the first 100 days under Part A. Unlike Part A, services delivered under Part B are reimbursed according to the Medicare Physician Fee Schedule ("MPFS") for each procedure.

56. Reimbursement under the MPFS is determined according to a standardized coding system assigned to procedures set forth in the Health Care Financing Administration's Common Procedure Coding System (HCPCS). Ctr. for Medicare and Medicaid Servs., Medicare Claims Processing Manual ("Medicare Claims Processing Manual"), CMS Pub. 100-04, Ch. 7, Secs. 20, 40.

57. Under the HCPCS, standardized codes, called Current Procedural Terminology ("CPT") codes, are assigned to various procedures. The HCPCS is divided into two principal subsystems, referred to as Level I and Level II of the HCPCS. HCPCS Level I codes ("CPT-4 codes") include those used primarily to identify medical services and procedures furnished by health care professionals, such as the therapy services at issue in this matter. The CPT code assigned to a medical procedure determines the payment amount under Part B. *Id.*

58. To receive reimbursement under Part B, the SNF must submit claims using CPT codes which correspond to the services provided. The 97000 series of CPT Codes (CPT Codes 97001- 97799) encompass the "Physical Medicine and Rehabilitation Evaluations" at issue here.

Many of these codes are broken up into time-based units with each unit representing 15 minutes of treatment in a certain CPT code.

**C. The Mechanism of Claims Reimbursement**

59. Claims for reimbursement for skilled therapy services provided in SNFs are submitted to Medicare on Claim Form 1450 or its electronic equivalent. At the end of its annual cost reporting period, the SNF must submit cost reports detailing the expenses and revenues for its facility along with the patient activity. The SNF is required to accurately report its actual payments to suppliers, including the skilled therapy providers.

60. The annual cost report is the final claim for payment and is submitted on CMS Form 2540-10. Annual cost reports constitute the final accounting of the facility's federal program reimbursement. The United States relies upon the annual cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare, Medicaid or other government programs.

61. In order to receive payment, the SNF must certify that all data in its annual cost report is accurately and truthfully reported and that it has complied with all applicable laws and regulations. The cost report requires the SNF employee or agent submitting the report to certify that he or she has read a statement that states in pertinent part: "If services identified in this cost report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result." The employee must further certify that:

> I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses ... and that to the best of my knowledge and belief, this report and statement are true, correct, complete, and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I

> am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

CMS Form 2540-10.

62. Where the SNF is part of a chain, the chain's headquarters must similarly submit an annual cost report.

63. SNFs may only receive reimbursement for services provided to their patients if they have submitted MDS forms for each patient. 42 C.F.R. § 483.315(e). MDS assessments are signed by the individuals who complete all or a portion of the MDS form and contain the following certification:

> I certify that the accompanying information accurately reflects resident assessment or tracking information for this resident and that I collected or coordinated collection of this information on the dates specified. To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds. I further understand that payment of such federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information and that I may be personally subject to and may subject my organization to substantial criminal, civil and/or administrative penalties for submitting false information. I also certify that I am authorized to submit this information by this facility or on its behalf.

64. MDS assessments are transmitted electronically by SNFs to the MDS database in their respective states which is then sent to a national MDS data base at CMS.

65. Specifically, a patient's RUG information is incorporated into the Health Insurance Prospective Payment System (HIPPS) code, which Medicare uses to determine the payment amount owed to the nursing facility. The HIPPS code must be included in the CMS-1450, which nursing facilities submit electronically to Medicare for payment. Medicare Claims Processing Manual, Ch. 25, Section 75.5. Medicare payment will depend largely on the HIPPS code the nursing facility submitted as part of the CMS-1450. *Id.*

66. SNFs must submit claims only for those services that are "of a quality which meets professionally recognized standards of health care." 42 U.S.C. § 1320c-5(a)(2) (providers may not submit claims for inadequate care); 42 U.S.C. § 1320a-7b(a)(1) and (3) (criminal penalties for submitting false claims when a provider knows it has no continued right to receive payment). Clinical practice requirements dictate that SNFs accurately document the number of therapy minutes provided to each beneficiary. In addition, SNFs must document in the medical record the care each beneficiary needs and receives, as well has how he or she responded to that therapy.

67. The Federal Government and the states share the cost of servicing Medicaid beneficiaries. The specific percentage that the Federal Government reimburses a state is referred to as the Federal Medical Assistance Percentage ("FMAP") and is calculated for each state according to a formula based on per capita income.

68. When an incorrect payment is made to a SNF, it is responsible for the payment unless the intermediary determines that it was without fault. In addition, Section 6402 of the Affordable Care Act (42 U.S.C. § 1320a-7k(d)) creates liability under the FCA for those who fail to disclose and refund Medicare or Medicaid overpayments within the later of 60 days after the date the overpayment is identified or the date the next applicable cost report is due.

69. SNFs are liable for any overpayment in the following situations: (a) when a SNF furnished erroneous information or failed to disclose facts it knew or should have known were relevant to payment of a benefit; (b) the overpayment was due to a mathematical or clerical error (*e.g.*, an error in calculation by the SNF, or overlapping or duplicate bills); (c) documentation was not submitted to substantiate that the services billed to Medicare were actually performed; or (d) Medicare paid for services not covered under the program and the

SNF should have known the services were not covered (*e.g*. medically unnecessary services). Ctr. for Medicare and Medicaid Servs., Medicare Financial Management Manual, CMS Pub. 100-06, Ch. 3, Sec. 90.1.

## IV. COMPLIANCE WITH MEDICARE REGULATIONS IS A PRE-REQUISITE FOR PAYMENT UNDER BOTH THE MEDICARE AND MEDICAID PROGRAMS

70. To be eligible to collect Medicare or Medicaid payments, a provider must enroll with those programs by submitting a Form CMS-855A application and supporting documentation to Medicare.[3] Among other things, that form provides "additional requirements that the provider must meet and maintain in order to bill the Medicare program." These requirements, which are prerequisites to payment under Medicare, include a certification that states: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare." CMS-855A, at 31. The provider also certifies that "***I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity***." *Id.* (emphasis added).

71. Similarly, Medicaid regulations require that all provider claim forms include the following statements near the provider's signature: "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment of this claim will be from

[3] Form CMS-855A is accessible at http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (last accessed August 12, 2015).

Federal and State funds, and that any falsification, or concealment of a material fact, may be prosecuted under Federal and State laws." 42 C.F.R § 455.18

72. Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements. Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA.

## **DEFENDANTS' FRAUDULENT CONDUCT**

73. Welsh-Bello and Rehabcare employees served as "rehabilitation managers" (the "Rehab Manager Defendants") who managed and directed the level and duration of the skilled therapy services Grace therapists provided on an inpatient basis to patients at its facilities.[4]

74. Defendants conspired to, and did, defraud Medicare by billing for therapy that was not medically necessary. Defendants did so by allowing the rehabilitation managers to invert the proper methodology for determining RUG scores. Rather than a therapist determining the appropriate amount of therapy to provide to provide to a patient, the Rehab Manager Defendants directed the Grace therapists to create Plans of Care that required therapy at the highest RUG level possible without regard for the medical necessity of the therapy. Defendants also caused the submission of claims for therapy that was not provided and claims for therapy for patients for whom therapy was no longer medically necessary because they were no longer benefitting from the therapy. The Rehab Manager Defendants' directives resulted in Grace

[4] Upon information and belief, Defendant Evergreen operates the Grace therapy department in a similar manner as Welsh-Bello and Rehabcare and thus has continued to cause Grace to submit false claims as described herein. The therapists providing the services, however, are now employed by Evergreen instead of by Grace Ancillary Services.

submitting false claims to Government healthcare programs. Additionally, Defendant Rehabcare has caused other non-party SNFs to submit false claims to Government healthcare programs.

## I. DEFENDANTS MANIPULATED PATIENTS' RUG SCORES TO MAXIMIZE REVENUE

75. When Relator began working at Grace's Soddy Daisy facility in 2009, Welsh-Bello served as the rehabilitation manager for the facility. Welsh-Bello continued in this role until Rehabcare replaced it around July-August 2013. Rehabcare was then replaced by Evergreen Rehabilitation on July 1, 2015.

76. Although their methods differed slightly, the Rehab Manager Defendants directed all Grace therapists to create Plans of Care that prescribed therapy for their patients at the highest possible RUG level regardless of whether this level of therapy was medically necessary.

77. Before Rehabcare replaced Welsh-Bello as the Soddy Daisy rehabilitation manager, the Rehabcare managers assembled all of the Grace therapists for a meeting ostensibly to teach them how to use the new Rehabcare-provided iPods so that the therapists could perform their documentation duties during therapy sessions. At this meeting, Rehabcare reiterated the expectation that the Grace therapists must create Plans of Care that place all patients in the highest RUG level possible regardless of their actual therapy needs. Afraid of being reprimanded, the Grace therapists complied with the Rehab Manager Defendants' orders.

## II. THERAPISTS WERE DIRECTED TO FALSIFY THEIR NOTES SO THAT CLAIMS COULD BE SUBMITTED FOR THERAPY SERVICES THAT WERE NOT PERFORMED

78. The Rehab Manager Defendants, in concert with Grace, also required the therapists to bill therapy minutes for every patient on their caseload, even if no therapy was provided because patients were sick or were refusing therapy.

79. In certain cases where the patient outright refused to see the therapist, the Rehab Manager Defendants instructed the therapist to keep returning until the patient finally allowed the therapist in the room even if no therapy services were ultimately provided.

80. In cases where the patients were refusing therapy, the Rehab Manager Defendants would instruct the therapists to stay in the room for at least 15 minutes to get at least one unit of therapy time. Often times, the therapists would sit in the room and talk to the patient about the importance of therapy and to try to convince them to do some therapy but no actual therapy was provided.[5]

81. There were also cases of therapy being imposed, over the therapist's own objections, on sick patients or on those who had made no progress for a significant period of time. A striking example of this conduct was the case of a patient in her late 80s who had shingles and was in such an incredible amount of pain that she was in room isolation, which meant that she was not able to leave her room to go to Grace's therapy room. Despite her repeated protests that she not be touched, Rehabcare ordered the Grace therapist to perform range of motion of therapy on her. The imposition of therapy on this patient was especially ludicrous given that she could not receive those therapy services that required a visit to the gym. In cases such as these, the therapists would often just have the patients walk around the room, do range of motion therapy and bill the session under the highest level possible.

82. Another example of this conduct, and of Grace and Rehabcare acting in concert to submit false claims, is the case of a 102-year-old man who was refusing therapy on the last day

---

[5] In cases of patients covered by Medicare Part B, the therapists often billed their "visit" under CPT Code 97530. In some cases, the therapists would simply have the patient sit up on the side of the bed and then bill "transfer training" under CPT Code 97530. CPT Code 97530 is to be used only for "therapeutic activities" in a one-on-one session with a patient that are designed to improve a patient's functional performance.

of his 100-day period under Medicare Part A. Relator tried twice, in vain, to encourage him to leave his room to do the therapy necessary to reach his existing RUG level even though he had ceased making progress for a month and a half. Relator explained the situation to her Rehabcare manager, Dottie Phillips, who ordered Relator to force the patient to submit to therapy. When Relator refused, Dottie Phillips explained what happened to Grace's-then Executive Director, Wally Struts. Mr. Struts then went into the patient's room and wore out the patient's resolve until het eventually relented and submitted to the therapy.[6]

83. As a result of her refusal to force therapy on a patient for whom therapy was no longer medically necessary, Relator was summoned to Mr. Strut's office and, in Ms. Phillips' presence, was asked to sign a paper that acknowledged that she had refused to see a patient on her caseload that day. Relator refused to sign the paper.

84. In addition, the Rehab Manager Defendants required unreasonably high productivity rates—as high as 95%-- for the therapists they managed.[7] Thus, when the therapists were either unable to provide any therapy to a patient and or a truncated amount of therapy (such as an amount less than what was ultra-high RUG billing), the Rehab Manager Defendants

---

[6] Although the patient was able to ride the stationary bike, given his advanced age and the fact that he had plateaued for a significant period of time, he should have been discharged instead of forced to continue therapy. At Soddy Daisy, patients who were discharged from skilled therapy services typically went into restorative care where a Certified Nursing Assistant ("CNA") would assist the patients in being more physically active and caring for themselves as much as possible. The problem was that Grace only employed one or two CNAs to handle all of their restorative care needs. Since these "restorative" CNAs were often pulled to help the CNAs on the floor, there was a dearth of CNAs providing necessary restorative care. As a result, patients often continued with their skilled therapy programs, which were more lucrative, long after they should have been transferred to restorative care.

[7] A therapist's productivity rate is usually based on the total number of billable treatment minutes divided by the total time the therapist worked.

instructed the therapists to document that all of the minutes required for the assigned RUG level were performed.

85. As a result of this mandate, therapists would often sit in a room with a patient who was physically incapable of therapy and bill for therapy time when no therapy was provided just so the patient could be billed at the existing RUG level. Therapists were compelled to follow these orders given the Rehab Manager Defendants' impossibly high productivity requirements and the threat of reprimands for not reaching the requisite minutes for the assigned RUG level.

## III. THE SYSTEMATIC VIOLATION OF RE-CERTIFICATION AND DISCHARGE REQUIREMENTS RESULTED IN THE SUBMISSION OF FALSE CLAIMS

86. Defendants furthered their efforts to increase revenue by improperly re-certifying patients for therapy services and failing to discharge them when it was medically appropriate to do so.

87. As discussed in paragraphs 40-44, *supra*, those patients who receive skilled therapy treatment covered under Part A must undergo assessments to determine the beneficiary's RUG category. The initial assessment to determine the RUG category or *per diem* amount takes place at the start of the patient's Part A stay.

88. After the initial assessment, the patient has additional assessments at regular intervals (including at the 30 day mark) to determine whether the patient's treatment plan remains medically necessary, whether the RUG category should be maintained or changed, or whether the patient should be discharged. CMS RAI Manual, Chapter 6 at 6-4.

89. A proper recertification of a patient for continued therapy must include an adequate written record of the reasons for the continued need for extended care services and the estimated period of time required for the patient to remain in the facility. Ctr. for Medicare and

Medicaid Servs., General Information Eligibility and Entitlement Manual, Ch. 4, Sec. 40.3; *accord* 42 C.F.R. § 424.20(c)(1) and (c)(2).

90. As with the initial decision regarding which level of skilled therapy services to provide to a patient, the decision to recertify a patient for continued therapy services must be based on medical necessity, including whether the patient's condition will improve significantly with the therapy in a reasonable period of time. *Id.*

91. The Rehab Manager Defendants, in concert with Grace, would routinely require the recertification of patients for additional therapy without the accompanying conclusion that additional therapy was medically necessary or reasonable.

92. Welsh-Bello's rehabilitation managers would have weekly staff meetings with the Grace therapists to question whether even those patients who were not making any progress should be discharged. At these meetings, Welsh-Bello would instruct therapists that there was a required two week notice for all discharges. When the two weeks expired, however, Welsh-Bello would frequently keep the patients at their therapy levels for an additional time even when they were showing no progress whatsoever.

93. Similarly, Rehabcare's rehabilitation managers had weekly staff meetings with Grace therapists ostensibly to discuss their patients' progress. During these meetings, Rehabcare would instruct the Grace therapists to treat patients as if they were always in an assessment period. If a therapist told Rehabcare that the patient had reached the patient's progress goals or was no longer making any progress, Rehabcare would instruct the therapist to revisit the issue after the "two week notice" period and then would often falsely recertify the patient for continued treatment even after the two weeks had expired.

94. As part of this "continued assessment" scheme, Rehabcare would also instruct Grace therapists to direct unnecessary additional therapy for patients by updating and changing rehabilitation goals for the purposes of supporting fraudulent recertification.

95. The Rehab Manager Defendants would instruct the Grace therapists to doctor their patient progress notes so that it appeared that the patients were making progress when, in fact, they were not. For example, Relator would often show the patient progress notes she had taken on her iPod to her Rehabcare rehabilitation manager (before they were officially submitted) at the end of the day and was always instructed not to include any "honest opinions" in those notes that could result in a patient's discharge.

96. Defendants' policy of recertifying patients for therapy when it was no longer reasonably necessary did not just result in the submission of false claims but also reduced the quality of the patients' lives when they were close to the end of their lives. For example, Relator had several patients who had been in therapy for several months but who had ceased making any progress after a few weeks. Despite the utter lack of progress and Relator's continued recommendation that the patient be discharged, the Rehab Manager Defendants instructed that these patients continue to be recertified for therapy services. Several terminally ill patients who had continued to be falsely recertified for therapy died shortly after finally being discharged from the therapy.

## IV. REHABCARE'S FRAUDULENT CONDUCT WAS NOT LIMITED TO THE SODDY DAISY FACILITY

97. Confidential Witnesses bolster the conclusion that the fraudulent conduct described herein as to Rehabcare was not just limited to the Soddy Daisy facility.

98. CW1 was a Rehabcare office manager in Bromall, Pennsylvania from 2010-2014. CW1 reported that the Rehabcare required its therapists to abide by an extremely high

productivity rate of between 92-95% and had required that therapists keep their patients at the ultra-high RUG level, regardless of whether such services were medically necessary.

99. CW2 was a Rehabcare Program Director in St. Clair, Missouri from 2011-2013. CW2 reported that the therapists routinely complained to her that they were subjected to the high productivity rate of 90%. Bonuses were given to those that achieved that productivity rate. Those who did not reach that level were reprimanded.

## V. VIOLATIONS OF GRACE'S 2013 CORPORATE INTEGRITY AGREEMENT

100. As a result of the qui tam action filed on March 8, 2010 in the United States District Court for the Eastern District of Tennessee captioned *U.S. et al. ex rel. Ottinger v. Grace Healthcare LLC, et al.*, No. 3:10-cv-83 (E.D. Tn.), Grace Healthcare and Grace Ancillary (collectively, "Grace") entered into a five-year Corporate Integrity Agreement ("CIA") intended to prevent the company submitting any fraudulent claims to Federal health care programs.[8]

101. Grace, in concert with Welsh-Bello, Rehabcare, and Evergreen, violated the CIA by continuing to engage in the very type of fraudulent conduct the CIA was designed to eliminate.

102. The CIA is an express contract between Grace and the Office of Inspector General ("OIG") of the United States Department of Health and Human Services (HHS), committed to "promote [Grace's] compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42

[8] The *Ottinger* action did not name Welsh-Bello, Rehabcare, or Evergreen as defendants and the settlement agreement in the *Ottinger* action did not include Grace's Soddy Daisy facility or a damages period beyond June 30, 2011. *See U.S. et al. ex rel. Ottinger v. Grace Healthcare LLC, et al.*, No. 3:10-cv-83 (E.D. Tn.), Dkt. No. 30 (filed Mar. 4, 2013).

U.S.C. § 1320a-7b(f)) (Federal health care program requirements)." *See* Ex.A, Grace CIA at 1.[9] Yet between 2013 and 2015, Grace, in concert with Welsh-Bello, Rehabcare, and Evergreen, continued to cause the submission of false claims to Federal health care programs and thus violated the CIA.

### A. The Corporate Integrity Agreement Establishes Grace's Obligations to Comply with the Medicare Program Requirements for Payment

103. The CIA includes extensive measures designed to ensure Grace's compliance with the Federal health care programs for payment. Those measures include: (1) development and implementation of a Code of Conduct, (2) Policies and Procedures, (3) Specific Training, and (4) the obligation to submit Annual Reports to OIG certifying Grace's compliance with the requirements of the CIA. The CIA also explicitly requires Grace's Board of Directors and top management to ensure that Grace complies with the Federal health care program requirements and the CIA's obligations. CIA at 3-4, Section III.A.3.

#### 1. The CIA's Code of Conduct

104. The CIA requires Grace to develop and implement a Code of Conduct to ensure Grace will fully comply with the Federal health care program requirements, "including its commitment to prepare and submit accurate claims consistent with such requirements." CIA at 5, Section III.B.1.a. All of Grace's employee were aware of the CIA, as the CIA requires the written Code of Conduct to be distributed to all Covered Persons and each Covered Person is required to certify in writing that he or she has received, read, understood, and would abide by Grace's Code of Conduct. CIA at 5, Section III.B.1. The Code of Conduct requires all Covered

[9] The OIG defines a CIA as a negotiated agreement in which "providers or entities agree to the [CIA's] obligations, and in exchange, OIG agrees not to seek their exclusion from participation in Medicare, Medicaid, or other Federal health care programs." Office of the Inspector General, Corporate Integrity Agreements, *available at* https://oig.hhs.gov/compliance/corporate-integrity-agreements/ (last accessed August 12, 2015).

Persons to comply with the CIA's requirements of the CIA and to report suspected violations of the requirements or credible allegations of resident harm to the Compliance Officer or other appropriate individual. *Id.*

105. The CIA defines a "Covered Person" to include officers; directors; United States-based employees of Grace; and "all contractors, subcontractors, agents, other persons who: (1) are involved directly or indirectly in the delivery of resident care, (2) make assessments of residents that affect treatment decision or reimbursement, or (3) performing billing or coding functions on behalf of Grace." CIA at 2, Section II.C.1. Given that Rehabcare provided management services to Grace and Evergreen provides therapy and management services to Grace, both are "Covered Persons" and are thus aware of the CIA.

106. Since Welsh-Bello provided rehabilitation management services to Grace up until June-July 2013, Rehabcare provided rehabilitation management services to Grace from July-August 2013 until June 30, 2015, and Evergreen provided therapy and rehabilitation management services to Grace starting on July 1, 2015, Welsh-Bello, Rehabcare, and Evergreen employees are "Covered Persons" under the CIA.

**2. The CIA's "Policies and Procedures" Requirement**

107. The Policies and Procedures the CIA required Grace to implement addressed how Grace's management and oversight of its rehabilitation therapy services at Grace facilities, stating "that skilled rehabilitation therapy: (1) be pursuant to an individualized plan of care; (2) be consistent with the nature and severity of the resident's individual illness or injury; (3) comply with accepted standards of medical practice; (4) be reasonable in terms of duration and quantity; (5) be reasonable and necessary given the resident's condition, and plan of care to improve, maintain, or slow deterioration of the resident's condition; and (6) only include services

that are inherently complex and require the skills of physical, speech, or occupational therapists, among other types of professionals." CIA at 6, Section III.B.2.b.

### 3. The CIA's "Specific Training" Requirement

108. The CIA further requires Grace to implement a training program in which each Covered Person is taught about the CIA requirements and the Compliance Program. CIA at 8-10. "Specific Training" was required for each Relevant Covered Person involved in the preparation or submission of claims for Federal health care program reimbursement. This "Specific Training" required discussion of:

- "Federal health care programs requirements regarding the accurate coding and submission of claims, including, but not limited to, ensuring the accuracy of the clinical data required under the Minimum Data Set (MDS) as specified by the Resident Assessment Instrument User's Manual, and ensuring appropriate and accurate use of the current Resource Utilization Groups (RUG) classification system." CIA at 7-8, Section III.C.2.a.i.
- "Applicable reimbursement statutes, regulations, and program requirements and directives." CIA at 8, Section III.C.2.a.iii.
- "The personal obligation of each individual involved in the claims submission process to ensure that such claims are accurate." CIA at 8, Section III.C.2.a.v.
- "Examples of proper and improper claims submission practices." CIA at 8, Section III.C.2.a.vii.

109. The CIA required Grace to provide "Specific Training" to all "Relevant Covered Persons." Relevant Covered Persons are "all Covered Persons who (a) are involved directly or indirectly in the delivery of rehabilitation therapy (2) perform assessments of residents that affect

treatment decisions regarding rehabilitation therapy services or affect reimbursement for rehabilitation therapy from Federal health care programs, including but not limited to Resource Utilization Groups (RUGs) under Medicare Part A, or (3) are involved in the preparation or submission of the Minimum Data Set (MDS) or claims for reimbursement from any Federal health care program." CIA at 2, Section II.C.2.

110. Per the CIA, the Welsh-Bello and Rehabcare rehabilitation managers who directed Grace therapists to submit false claims for therapy and any Evergreen personnel who engaged in similar conduct are Relevant Covered Persons who were required to receive the CIA-mandated "Specific Training." CIA at 9, Section III.C.4.

111. To the extent such "Specific Training" was provided, Grace, Rehabcare, and Evergreen ignored it by continuing to cause the submission of false claims to Federal health care programs.

**B. Grace Violated the CIA by Not Reporting Its Fraudulent Conduct to the Government**

112. The CIA requires Grace to notify the Government of any "Reportable Events," defined to include any matter that involves "a substantial Overpayment[10]" or that "a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized." CIA at 16, Section III.I.1.

113. The CIA stipulates that Grace must submit an Annual Report regarding Grace's compliance activities, including "a summary of Reportable Events (as defined in Section III.I)

[10] The CIA defines "Overpayment" as "the amount of money Grace has received in excess of the amount due and payable under any Federal healthcare program requirements." CIA at 16, Section III.H.1.

identified during the Reporting Period and the status of any corrective action relating to all such Reportable Events," and "a report of the aggregate Overpayments that have been returned to the Federal health care programs." CIA at 22-23, Section V.B.12, 13, 14.

114. Upon information and belief Grace, in concert with Welsh-Bello, Rehabcare and Evergreen, has concealed its continuing fraudulent conduct from government oversight and therefore Grace's Annual Reports do not satisfy the CIA's reporting requirements.

115. Grace violated the terms of the CIA each time it failed to properly report to OIG its submission of medically unnecessary therapy claims and claims for therapy services that were not performed. Grace's active concealment of these false claims furthered its fraudulent scheme.

### C. The Violations of the CIA Triggered Grace's Requirement to Pay Stipulated Penalties

116. The CIA contains an established duty and obligation to pay the Government money, in the form of stipulated penalties, which arises from Grace's contractually binding requirement to report instances of fraudulent conduct.

117. Specifically, the CIA contains a section entitled "Breach and Default Provisions," which provides "Stipulated Penalties" as a contractual remedy for any failure by Grace to comply with its obligations under the CIA. CIA at 26-32, Section X. These stipulated penalties include, *inter alia*:

- "A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Grace fails to establish or implement any of the following obligations," including, but not limited to, "a Compliance Officer," "a Compliance Committee," "the Board compliance obligations," "a written Code of Conduct," "written Policies and Procedures," "the training of Covered Persons, Relevant Covered Persons, and Board of

Directors," and "reporting of Reportable Events." CIA at 26-27, Section X.A.1.a, b, c, d, e, f, j;

- "A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of Grace as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA." CIA at 27, Section X.A.6; and
- "A Stipulated Penalty of $1,000 for each day Grace fails to comply fully and adequately with any obligations of this CIA." CIA at 28, Section X.A.7.

118. By failing to comply with the CIA by continuing to submit false claims to Federal healthcare programs, Grace, in concert with Welsh-Bello, Rehabcare and Evergreen, has ignored both the letter and the spirit of the CIA. Grace has done all it can to subvert the intentions of federal law, regulations, and the CIA in order to maximize corporate profits while still participating in Federal healthcare reimbursement programs.

**COUNT I**

**VIOLATIONS OF 31 U.S.C § 3729(a)(1)(A)**

119. Relator, on behalf of the United States, realleges and incorporates by reference all preceding paragraphs of this Complaint.

120. During the relevant period, Defendants presented numerous claims for payment to the United States Government through Medicare.

121. For the reasons alleged herein, many of these claims were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendants knowingly presented, and caused to be presented, to an officer and employee of the United States Government false and fraudulent claims for payment and approval in violation of 31 U.S.C. § 3729(a)(1)(A).

122. Defendants had actual knowledge of the falsity of these claims, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

123. The United States suffered damages as a result of false claims by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT II

## VIOLATIONS OF 31 U.S.C § 3729(a)(1)(B)

124. Relator, on behalf of the United States, realleges and incorporates by reference all preceding paragraphs of this Complaint.

125. During the relevant period, Defendants presented numerous records and statements to the United States Government through Medicare.

126. For the reasons alleged herein, many of these records and statements were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendants knowingly made, used, and caused to be made and used, false records and statements to get false and fraudulent claims paid and approved by the United States Government in violation of 31 U.S.C. § 3729(a)(1)(B).

127. Defendants had actual knowledge of the falsity of these statements, or deliberately ignored or recklessly disregarded their truth or falsity, within the meaning of the FCA.

128. The United States suffered damages as a result of false records and statements by Defendants and is entitled to recover its losses and obtain other relief available under the FCA.

## COUNT III

### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(C)

129. Relator, on behalf of the United States, realleges and incorporates by reference all preceding paragraphs of this Complaint.

130. By engaging in the misconduct alleged herein, Defendants conspired with one another to violate 31 U.S.C. § 3729(a)(1)(A) and (B), in violation of 31 U.S.C. § 3729(a)(1)(C).

131. Defendants knew it was unlawful to violate or cause another to violate the FCA and that it was unlawful to submit claims to Medicare for therapy services that were not reasonable or medically necessary.

132. By virtue of Defendants conspiring to and violating the FCA, the United States has been damaged in a substantial amount to be determined at trial.

## COUNT III

### VIOLATIONS OF 31 U.S.C § 3729(a)(1)(G)

133. Relator, on behalf of the United States, realleges and incorporates by reference all preceding paragraphs of this Complaint.

134. During the relevant period, Defendants presented numerous records and statements material to an obligation to pay or transmit money or property to the United States Government through Medicare.

135. For the reasons alleged herein, these records and statements were knowingly false and fraudulent within the meaning of the FCA. More specifically, Defendants knowingly made, used, and caused to be made and used, these records and statements to get false and fraudulent claims paid and approved by the United States Government and/or knowingly concealed or

knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, all in violation of 31 U.S.C. § 3729(a)(1)(G).

136. The United States suffered damages as a result of Defendants' false records and statements and knowingly avoided or decreased obligations and is entitled to recover its losses and obtain other relief available under the FCA.

## <u>COUNT IV</u>

## VIOLATIONS OF THE TENNESSEE MEDICAID FALSE CLAIMS ACT (Tenn. Code Ann. § 71-5-181 *et seq*.)

137. Relators incorporate herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

138. This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183 (b).

139. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

140. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B)

141. Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

142. By engaging in the misconduct alleged herein, Defendants conspired with one another to violate Tenn. Code Ann. § 71-5-182(a)(1)(A)-(B) and Tenn. Code Ann. § 71-5-182(a)(1)(D) in violation of Tenn. Code Ann. § 71-5-182(a)(1)(C).

143. The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for medically unnecessary therapy services.

## PRAYER FOR RELIEF

WHEREFORE, Relator pray that judgment be entered against the Defendants, ordering that:

A. Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, et seq.;

B. Defendants cease and desist from violating the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181(a)(1)(A);

C. Defendants pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

D. Defendants pay Tennessee not less than $5,000 and not more than $25,000 for each violation of Tenn. Code Ann. § 71-5-182 plus three times the amount of damages Tennessee has sustained because of Defendants' misconduct;

E. Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 71-5-183(d)(1)(A);

F. Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and Tenn. Code Ann. § 71-5-183(d)(1)(C) ;

G. The United States and Relator be awarded such other, further or different relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Relator hereby demands a trial by jury.

DATED: August 14, 2015

Respectfully submitted,

PROVOST UMPHREY LAW FIRM LLP

By: /s/ Michael Hamilton

Michael Hamilton, Esq.
TN. BPR #010720
4205 Hillsboro Pike, Suite 303
Nashville, Tennessee 37215
Tel: 615.297-1932
Email: mhamilton@provostumphrey.com

***Local Counsel for Plaintiff-Relator Pamela Anderson***

Anna C. Dover, Esq.
**MILBERG LLP**
One Pennsylvania Plaza
New York, New York 10119-0165
Tel: 212.594.5300
Fax: 212.868.1229
***Lead Counsel for Plaintiff-Relator Pamela Anderson***

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2015, I served the attached complaint and exhibit on the parties listed below in accordance with 31 U.S.C. §3730(b)(2) and Tenn. Code An. § 71-5-183(b)(2).

The Honorable Loretta E. Lynch
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

William C. Killian, Esq.
United States Attorney
Eastern District of Tennessee
800 Market Street, Suite 211
Knoxville, TN 37902
Attn: Civil Process Clerk

Herbert H. Slatery, III, Esq.
Tennessee Attorney General
Office of the Attorney General and Reporter
P.O. Box 20207
Nashville, TN 37202-0207
Attn: Civil Process Clerk

/s/ Michael Hamilton
Michael Hamilton

# EXHIBIT A

**CORPORATE INTEGRITY AGREEMENT**
**BETWEEN THE**
**OFFICE OF INSPECTOR GENERAL**
**OF THE**
**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**AND**
**GRACE HEALTHCARE, LLC**
**AND**
**GRACE ANCILLARY SERVICES, LLC**

## I. PREAMBLE

Grace Healthcare, LLC, and Grace Ancillary Services, LLC (hereinafter referred to collectively as "Grace") hereby enter into this Corporate Integrity Agreement (CIA) with the Office of Inspector General (OIG) of the United States Department of Health and Human Services (HHS) to promote compliance with the statutes, regulations, and written directives of Medicare, Medicaid, and all other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) (Federal health care program requirements). Contemporaneously with this CIA, Grace is entering into a Settlement Agreement with the United States.

## II. TERM AND SCOPE OF THE CIA

A. The period of the compliance obligations assumed by Grace under this CIA shall be five years from the effective date of this CIA. The "Effective Date" shall be the date on which the final signatory of this CIA executes this CIA. Each one-year period, beginning with the one-year period following the Effective Date, shall be referred to as a "Reporting Period."

B. Sections VII, X, and XI shall expire no later than 120 days after OIG's receipt of: (1) Grace's final annual report; or (2) any additional materials submitted by Grace pursuant to OIG's request, whichever is later.

C. The scope of this CIA shall be governed by the following definitions:

1. "Covered Persons" includes:

a. all owners, officers, directors, and employees of Grace; and

b. all contractors, subcontractors, agents, and other persons who (1) are involved directly or indirectly in the delivery of resident care, (2) make assessments of residents that affect treatment decisions or reimbursement, or (3) perform billing or coding functions on behalf of Grace.

Notwithstanding the above, this term does not include part-time or per diem employees, contractors, subcontractors, agents, and other persons who are not reasonably expected to work more than 160 hours per year, except that any such individuals shall become "Covered Persons" at the point when they work more than 160 hours during the calendar year. Any nonemployee private caregivers and/or attending physicians hired by any resident or the family or friends of any resident of Grace are not "Covered Persons," regardless of the hours worked per year in Grace.

2. "Relevant Covered Persons" includes all Covered Persons who (1) are involved directly or indirectly in the delivery of rehabilitation therapy (2) perform assessments of residents that affect treatment decisions regarding rehabilitation therapy services or affect reimbursement for rehabilitation therapy from Federal health care programs, including but not limited to Resource Utilization Groups (RUGs) under Medicare Part A, or (3) are involved in the preparation or submission of the Minimum Data Set (MDS) or claims for reimbursement from any Federal health care program.

## III. CORPORATE INTEGRITY OBLIGATIONS

Grace shall establish and maintain a Compliance Program that includes the following elements:

### A. Compliance Officer, Compliance Committee, and Board of Directors

1. *Compliance Officer*. Within 90 days after the Effective Date, Grace shall appoint an individual to serve as its Compliance Officer and shall maintain a Compliance Officer for the term of the CIA. The Compliance Officer shall be responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and with Federal health care program requirements. The Compliance Officer must have sufficient compliance experience to effectively oversee the implementation of the requirements of this CIA.

The Compliance Officer shall be a member of senior management of Grace, shall report directly to the Chief Executive Officer of Grace, shall make periodic (at least quarterly) reports regarding compliance matters directly to the Board of Directors of Grace, and shall be authorized to report on such matters to the Board of Directors at any time. The Compliance Officer shall not be or be subordinate to the General Counsel or Chief Financial Officer. The Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by Grace as well as for any reporting obligations created under this CIA. Any noncompliance job responsibilities of the Compliance Officer shall be limited and must not interfere with the Compliance Officer's ability to perform the duties outlined in this CIA.

Grace shall report to OIG, in writing, any change in the identity of the Compliance Officer, or any actions or changes that would affect the Compliance Officer's ability to perform the duties necessary to meet the obligations in this CIA, within five days after such a change.

2. *Compliance Committee*. Within 90 days after the Effective Date, Grace shall appoint a Compliance Committee. The Compliance Committee shall, at a minimum, include the Compliance Officer and other members of senior management necessary to meet the requirements of this CIA (e.g., senior executives of relevant departments, such as billing, nursing, therapy, human resources, audit, and operations). The Compliance Officer shall chair the Compliance Committee and the Committee shall support the Compliance Officer in fulfilling his/her responsibilities (e.g., shall assist in the analysis of the Grace's risk areas and shall oversee monitoring of internal and external audits and investigations). The Compliance Committee shall meet at least quarterly.

Grace shall report to OIG, in writing, any changes in the composition of the Compliance Committee, or any actions or changes that would affect the Compliance Committee's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

3. *Board of Director Compliance Obligations.* The governing body of Grace (Board) shall be responsible for the review and oversight of matters related to compliance with Federal health care program requirements and the obligations of this CIA. The individuals who serve on the Board of Directors committee shall be readily available to the Compliance Officer to respond to any issues or questions that might arise.

The Board shall, at a minimum, be responsible for the following:

a. meeting at least quarterly to review and oversee Grace's Compliance Program, including but not limited to the performance of the Compliance Officer and Compliance Committee;

b. ensuring that Grace adopts and implements policies, procedures, and practices designed to ensure compliance with the requirements set forth in this CIA and Federal health care program requirements; and

c. for each Reporting Period of the CIA, adopting a resolution, signed by each member of the Board summarizing its review and oversight of Grace's compliance with Federal health care program requirements and the obligations of this CIA.

At minimum, the resolution shall include the following language:

"The Board of Directors has made a reasonable inquiry into the operations of Grace's Compliance Program including the performance of the Compliance Officer and the Compliance Committee. Based on its inquiry and review, the Board had concluded that, to the best of its knowledge, Grace has implemented an effective Compliance Program to meet Federal health care program requirements and the obligations of the CIA."

If the Board is unable to provide such a conclusion in the resolution, the Board shall include in the resolution a written explanation of the reasons why it is unable to provide the conclusion and the steps it is taking to implement an effective Compliance Program at Grace.

Grace shall report to OIG, in writing, any changes in the composition of the Board, or any actions or changes that would affect the Board's ability to perform the duties necessary to meet the obligations in this CIA, within 15 days after such a change.

B. <u>Written Standards</u>

1. *Code of Conduct*. Within 90 days after the Effective Date, Grace shall develop, implement, and distribute a written Code of Conduct to all Covered

Persons. Grace shall make the promotion of, and adherence to, the Code of Conduct an element in evaluating the performance of all employees. The Code of Conduct shall, at a minimum, set forth:

a. Grace's commitment to full compliance with all Federal health care program requirements, including its commitment to prepare and submit accurate claims consistent with such requirements;

b. Grace's requirement that all of its Covered Persons shall be expected to comply with all Federal health care program requirements and with Grace's own Policies and Procedures;

c. the requirement that all of Grace's Covered Persons shall be expected to report to the Compliance Officer, or other appropriate individual designated by Grace, suspected violations of any Federal health care program requirements or of Grace's own Policies and Procedures;

d. the requirement that all of Grace's Covered Persons shall immediately report to the Compliance Officer, or other appropriate individual designated by Grace, credible allegations of resident harm and such report shall be complete, full, and honest; and

e. the right of all individuals to use the Disclosure Program described in Section III.E, and Grace's commitment to nonretaliation and to maintain, as appropriate, confidentiality and anonymity with respect to such disclosures.

Within 90 days after the Effective Date, each Covered Person shall certify, in writing or in electronic form, that he or she has received, read, understood, and shall abide by Grace's Code of Conduct. New Covered Persons shall receive the Code of Conduct and shall complete the required certification within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later.

Grace shall periodically review the Code of Conduct to determine if revisions are appropriate and shall make any necessary revisions based on such review. Any revised

Code of Conduct shall be distributed within 30 days after any revisions are finalized. Each Covered Person shall certify, in writing, that he or she has received, read, understood, and shall abide by the revised Code of Conduct within 30 days after the distribution of the revised Code of Conduct.

2. *Policies and Procedures*. Within 90 days after the Effective Date, Grace shall implement written Policies and Procedures regarding the operation of its compliance program, including the compliance program requirements outlined in this CIA and Provider's compliance with Federal health care program requirements. The Policies and Procedures shall address, at a minimum:

a. the compliance program requirements outlined in this CIA; and

b. management and oversight of rehabilitation therapy services provided to residents at Grace facilities, including, but not limited to, the requirements that skilled rehabilitation therapy: (1) be pursuant to an individualized plan of care; (2) be consistent with the nature and severity of the resident's individual illness or injury; (3) comply with accepted standards of medical practice; (4) be reasonable in terms of duration and quantity; (5) be reasonable and necessary given the resident's condition, and plan of care to improve, maintain, or slow deterioration of the resident's condition; and (6) only include services that are inherently complex and require the skills of physical, speech, or occupational therapists, among other types of professionals.

Within 120 days after the Effective Date, the Policies and Procedures shall be made available to all Covered Persons. Appropriate and knowledgeable staff shall be available to explain the Policies and Procedures.

At least annually (and more frequently, if appropriate), Grace shall assess and update, as necessary, the Policies and Procedures. Within 30 days after the effective date of any revisions, any such revised Policies and Procedures shall be made available to all Covered Persons.

C. Training and Education

1. *General Training*. Within 120 days after the Effective Date, Grace shall provide at least one hour of General Training to each Covered Person. This training, at a minimum, shall explain Grace's:

a. CIA requirements; and

b. Compliance Program, including the Code of Conduct.

New Covered Persons shall receive the General Training described above within 30 days after becoming a Covered Person or within 90 days after the Effective Date, whichever is later. After receiving the initial General Training described above, each Covered Person shall receive at least one hour of General Training in each subsequent Reporting Period.

For purposes of the General Training requirements, if Grace provided training on its CIA and Compliance Program that satisfies the requirements set forth in Section III.C.1, above, to Covered Persons within 20 days prior to the Effective Date, then OIG will credit that training for purposes of satisfying the applicable part of Grace's General Training obligations for the first Reporting Period of the CIA.

2. *Specific Training*.

a. Within 120 days after the Effective Date, each Relevant Covered Person who is involved in the preparation or submission of claims for reimbursement from any Federal health care program shall receive at least two hours of Specific Training in addition to the General Training required above. This Specific Training shall include a discussion of:

i. Federal health care programs requirements regarding the accurate coding and submission of claims, including, but not limited to, ensuring the accuracy of the clinical data required under the Minimum Data Set (MDS) as specified by the Resident Assessment Instrument User's Manual, and ensuring appropriate

and accurate use of the current Resource Utilization Groups (RUG) classification system;

ii. the policies and procedures implemented pursuant to Section III.B.2;

iii. applicable reimbursement statutes, regulations, and program requirements and directives;

iv. policies, procedures, and other requirements applicable to the documentation of medical records;

v. the personal obligation of each individual involved in the claims submission process to ensure that such claims are accurate;

vi. the legal sanctions for violations of the Federal health care program requirements; and

vii. examples of proper and improper claims submission practices.

b. Within 90 days after the Effective Date, each Relevant Covered Person who is involved directly or indirectly in the delivery of rehabilitation therapy, or performs assessments of residents that affect treatment decisions regarding rehabilitation therapy services or that affect reimbursement for rehabilitation therapy, shall receive at least two hours of Specific Training pertinent to their responsibilities in addition to the General Training required above. This Specific Training shall include a discussion of:

i. policies, procedures, and other requirements applicable to the documentation of medical records;

ii. the coordinated interdisciplinary approach to providing care and related communication between disciplines;

iii. the policies and procedures implemented pursuant to Section III.B.2;

iv. the personal obligation of each individual involved in resident care to ensure that care is appropriate and meets professionally recognized standards of care;

v. examples of proper and improper care; and

vi. legal sanctions for violations of the Federal health care program requirements.

New Relevant Covered Persons shall receive this training within 30 days after the beginning of their employment or becoming Relevant Covered Persons, or within 90 days after the Effective Date, whichever is later.

After receiving the initial Specific Training described in this section, each Relevant Covered Person shall receive at least two hours of Specific Training, in addition to the General Training, in each subsequent Reporting Period.

For purposes of the Specific Training requirements, if Grace provided training on its CIA and Compliance Program that satisfies the requirements set forth in Section III.C.1, above, to Covered Persons within 20 days prior to the Effective Date, then OIG will credit that training for purposes of satisfying the applicable part of Grace's General Training obligations for the first Reporting Period of the CIA.

3. *Board Member Training*. Within 90 days after the Effective Date, Grace shall provide at least two hours of training to each member of the Board of Directors, in addition to the General Training. This training shall address the responsibilities of board members and corporate governance.

New members of the Board of Directors shall receive the Board Member Training described above within 30 days after becoming a member or within 90 days after the Effective Date, whichever is later.

4. *Certification.* Each individual who is required to attend training shall certify, in writing or in electronic form, that he or she has received the required training. The certification shall specify the type of training received and the date

received. The Compliance Officer (or designee) shall retain the certifications, along with all course materials.

5. *Qualifications of Trainer.* Persons providing the training shall be knowledgeable about the subject area.

6. *Update of Training.* Grace shall review the training annually, and, where appropriate, update the training to reflect changes in Federal health care program requirements, any issues discovered during internal audits, the MDS Review, or the Therapy Systems Assessment, and any other relevant information.

7. *Computer-based Training.* Grace may provide the training required under this CIA through appropriate computer-based training approaches. If Grace chooses to provide computer-based training, it shall make available appropriately qualified and knowledgeable staff or trainers to answer questions or provide additional information to the individuals receiving such training.

D. Review Procedures

1. *General Description*

a. *Engagement of Independent Review Organization*. Within 90 days after the Effective Date, Grace shall engage an entity (or entities), such as an accounting, auditing, or consulting firm (hereinafter "Independent Review Organization" or "IRO"), to perform the reviews listed in this Section III.D. The IRO may retain additional personnel, including consultants, if needed to help meet the IRO's obligations under the CIA. The applicable requirements relating to the IRO are outlined in Appendix A to this CIA, which is incorporated by reference.

b. *Retention of Records*. The IRO and Grace shall retain and make available to OIG, upon request, all work papers, supporting documentation, correspondence, and draft reports (those exchanged between the IRO and Grace) related to the reviews.

c. *Selection of facilities*. For each Reporting Period, the IRO shall select three facilities to assess and review. The three facilities selected for the Reporting Period shall be known as the "Subject Facilities."

2. *Minimum Data Set (MDS) Review.* The IRO shall review Grace's coding, billing, and claims submission to Medicare Part A and the reimbursement received (MDS Review) and shall prepare a MDS Review Report, as outlined in Appendix B to this CIA, which is incorporated by reference.

3. *Therapy Systems Assessment.* The IRO shall assess the effectiveness, reliability, and thoroughness of Grace's oversight of its therapy services, as outlined in Appendix C to this CIA, which is incorporated by reference.

4. *Unallowable Cost Review.* For the first Reporting Period, the IRO shall conduct a review of Grace's compliance with the unallowable cost provisions of the Settlement Agreement. For the 10 facilities identified in the Settlement Agreement, the IRO shall determine whether Grace has complied with its obligations not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify to applicable federal or state payors any unallowable costs included in payments previously sought from the United States, or any state Medicaid program. This unallowable costs analysis shall include, but not be limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Grace or any affiliates. To the extent that such cost reports, cost statements, information reports, or payment requests, even if already settled, have been adjusted to account for the effect of the inclusion of the unallowable costs, the IRO shall determine if such adjustments were proper. In making this determination, the IRO may need to review cost reports and/or financial statements from the year in which the Settlement Agreement was executed, as well as from previous years.

5. *Unallowable Cost Review Report.* The IRO shall prepare a report based upon the Unallowable Cost Review performed (Unallowable Cost Review Report). The Unallowable Cost Review Report shall include the IRO's findings and supporting rationale regarding the Unallowable Cost Review and whether Grace has complied with its obligation not to charge to, or otherwise seek payment from, federal or state payors for unallowable costs (as defined in the Settlement Agreement) and its obligation to identify

to applicable federal or state payors any unallowable costs included in payments previously sought from such payor.

6. *Validation Review*. In the event OIG has reason to believe that: (a) Grace's MDS Review, Therapy Systems Assessment, or Unallowable Cost Review fails to conform to the requirements of this CIA; or (b) the IRO's findings or MDS Review, Therapy Systems Assessment, or Unallowable Cost Review results are inaccurate, OIG may, at its sole discretion, conduct its own review to determine whether the MDS Review, Therapy Systems Assessment, or Unallowable Cost Review complied with the requirements of the CIA and/or the findings or MDS Review, Therapy Systems Assessment, or Unallowable Cost Review results are inaccurate (Validation Review). Grace shall pay for the reasonable cost of any such review performed by OIG or any of its designated agents. Any Validation Review of Reports submitted as part of Grace's final Annual Report shall be initiated no later than one year after Grace's final submission (as described in Section II) is received by OIG.

Prior to initiating a Validation Review, OIG shall notify Grace of its intent to do so and provide a written explanation of why OIG believes such a review is necessary. To resolve any concerns raised by OIG, Grace may request a meeting with OIG to: (a) discuss the results of any MDS Review, Therapy Systems Assessment, or Unallowable Cost Review submissions or findings; (b) present any additional information to clarify the results of the MDS Review, Therapy Systems Assessment, or Unallowable Cost Review or to correct the inaccuracy of the MDS Review, Therapy Systems Assessment, or Unallowable Cost Review; and/or (c) propose alternatives to the proposed Validation Review. Grace agrees to provide any additional information as may be requested by OIG under this Section III.D.6 in an expedited manner. OIG will attempt in good faith to resolve any MDS Review, Therapy Systems Assessment, or Unallowable Cost Review issues with Grace prior to conducting a Validation Review. However, the final determination as to whether or not to proceed with a Validation Review shall be made at the sole discretion of OIG.

7. *Independence and Objectivity Certification*. The IRO shall include in its report(s) to Grace a certification that the IRO has (a) evaluated its professional independence and objectivity with respect to the reviews conducted under this Section III.D and (b) concluded that it is, in fact, independent and objective, in accordance with the requirements specified in Appendix A to this CIA.

E. <u>Disclosure Program</u>

Within 90 days after the Effective Date, Grace shall establish a Disclosure Program that includes a mechanism (e.g., a toll-free compliance telephone line) to enable individuals to disclose, to the Compliance Officer or some other person who is not in the disclosing individual's chain of command, any identified issues or questions associated with Grace's policies, conduct, practices, or procedures with respect to a Federal health care program believed by the individual to be a potential violation of criminal, civil, or administrative law. Grace shall appropriately publicize the existence of the disclosure mechanism (e.g., via periodic e-mails to employees or by posting the information in prominent common areas).

The Disclosure Program shall emphasize a nonretribution, nonretaliation policy, and shall include a reporting mechanism for anonymous communications for which appropriate confidentiality shall be maintained. Upon receipt of a disclosure, the Compliance Officer (or designee) shall gather all relevant information from the disclosing individual. The Compliance Officer (or designee) shall make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted. For any disclosure that is sufficiently specific so that it reasonably: (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, Grace shall conduct an internal review of the allegations set forth in the disclosure and ensure that proper follow-up is conducted.

The Compliance Officer (or designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received (whether anonymous or not), the status of the respective internal reviews, and any corrective action taken in response to the internal reviews.

F. Ineligible Persons

1. *Definitions*. For purposes of this CIA:

a. an "Ineligible Person" shall include an individual or entity who:

i. is currently excluded, debarred, suspended, or otherwise ineligible to participate in the Federal health care

programs or in Federal procurement or nonprocurement programs; or

ii. has been convicted of a criminal offense that falls within the scope of 42 U.S.C. § 1320a-7(a), but has not yet been excluded, debarred, suspended, or otherwise declared ineligible.

b. "Exclusion Lists" include:

i. the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://www.oig.hhs.gov); and

ii. the General Services Administration's System for Award Management (available through the Internet at http://www.sam.gov).

2. *Screening Requirements.* Grace shall ensure that all prospective and current Covered Persons are not Ineligible Persons, by implementing the following screening requirements.

a. Grace shall screen all prospective Covered Persons against the Exclusion Lists prior to engaging their services and, as part of the hiring or contracting process, shall require such Covered Persons to disclose whether they are Ineligible Persons.

b. Grace shall screen all Covered Persons against the Exclusion Lists within 90 days after the Effective Date and on an annual basis thereafter.

c. Grace shall implement a policy requiring all Covered Persons to disclose immediately any debarment, exclusion, suspension, or other event that makes that person an Ineligible Person.

Nothing in Section III.F affects Grace's responsibility to refrain from (and liability for) billing Federal health care programs for items or services furnished, ordered, or prescribed by excluded persons. Grace understands that items or services furnished by excluded persons are not payable by Federal health care programs and that Grace may be liable for overpayments and/or criminal, civil, and administrative sanctions for employing or contracting with an excluded person regardless of whether Grace meets the requirements of Section III.F.

3. *Removal Requirement*. If Grace has actual notice that a Covered Person has become an Ineligible Person, Grace shall remove such Covered Person from responsibility for, or involvement with, Grace's business operations related to the Federal health care programs and shall remove such Covered Person from any position for which the Covered Person's compensation or the items or services furnished, ordered, or prescribed by the Covered Person are paid in whole or part, directly or indirectly, by Federal health care programs or otherwise with Federal funds at least until such time as the Covered Person is reinstated into participation in the Federal health care programs.

4. *Pending Charges and Proposed Exclusions*. If Grace has actual notice that a Covered Person is charged with a criminal offense that falls within the scope of 42 U.S.C. §§ 1320a-7(a), 1320a-7(b)(1)-(3), or is proposed for exclusion during the Covered Person's employment or contract term, Grace shall take all appropriate actions to ensure that the responsibilities of that Covered Person have not and shall not adversely affect the quality of care rendered to any beneficiary, resident, or resident, or any claims submitted to any Federal health care program.

G. <u>Notification of Government Investigation or Legal Proceedings</u>

Within 30 days after discovery, Grace shall notify OIG, in writing, of any ongoing investigation or legal proceeding known to Grace conducted or brought by a governmental entity or its agents involving an allegation that Grace has committed a crime or has engaged in fraudulent activities. This notification shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding. Grace shall also provide written notice to OIG within 30 days after the resolution of the matter, and shall provide OIG with a description of the findings and/or results of the investigation or proceedings, if any.

H. <u>Repayment of Overpayments</u>

1. *Definition of Overpayments*. For purposes of this CIA, an "Overpayment" shall mean the amount of money Grace has received in excess of the amount due and payable under any Federal health care program requirements.

2. *Repayment of Overpayments*

a. If, at any time, Grace identifies or learns of any Overpayment, Grace shall repay the Overpayment to the appropriate payor (e.g., Medicare fiscal intermediary or carrier) within 60 days after identification of the Overpayment and take remedial steps within 90 days after identification (or such additional time as may be agreed to by the payor) to correct the problem, including preventing the underlying problem and the Overpayment from recurring. If not yet quantified, within 60 days after identification, Grace shall notify the payor of its efforts to quantify the Overpayment amount along with a schedule of when such work is expected to be completed. Notification and repayment to the payor shall be done in accordance with the payor's policies.

b. Notwithstanding the above, notification and repayment of any Overpayment amount that routinely is reconciled or adjusted pursuant to policies and procedures established by the payor should be handled in accordance with such policies and procedures.

I. Reportable Events

1. *Definition of Reportable Event*. For purposes of this CIA, a "Reportable Event" means anything that involves:

a. a substantial Overpayment;

b. a matter that a reasonable person would consider a probable violation of criminal, civil, or administrative laws applicable to any Federal health care program for which penalties or exclusion may be authorized;

c. the employment of or contracting with a Covered Person who is an Ineligible Person as defined by Section III.F.1.a; or

d. the filing of a bankruptcy petition by Grace.

A Reportable Event may be the result of an isolated event or a series of occurrences.

2. *Reporting of Reportable Events*. If Grace determines (after a reasonable opportunity to conduct an appropriate review or investigation of the allegations) through any means that there is a Reportable Event, Grace shall notify OIG, in writing, within 30 days after making the determination that the Reportable Event exists.

3. *Reportable Events under Section III.I.1.a*. For Reportable Events under Section III.I.1.a, the report to OIG shall be made at the same time as the repayment to the payor required in Section III.H, and shall include:

a. a copy of the notification and repayment to the payor required in Section III.H.2;

b. a description of the steps taken by Grace to identify and quantify the Overpayment;

c. a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

d. a description of Grace's actions taken to correct the Reportable Event; and

e. any further steps Grace plans to take to address the Reportable Event and prevent it from recurring.

4. *Reportable Events under Section III.I.1.b and c*. For Reportable Events under Section III.I.1.b and III.I.1.c, the report to OIG shall include:

a. a complete description of the Reportable Event, including the relevant facts, persons involved, and legal and Federal health care program authorities implicated;

b. a description of Grace's actions taken to correct the Reportable Event;

c. any further steps Grace plans to take to address the Reportable Event and prevent it from recurring; and

d. if the Reportable Event has resulted in an Overpayment, a description of the steps taken by Grace to identify and quantify the Overpayment.

5. *Reportable Events under Section III.I.1.d*. For Reportable Events under Section III.I.1.e, the report to the OIG shall include documentation of the bankruptcy filing and a description of any Federal health care program authorities implicated.

6. *Reportable Events Involving the Stark Law*. Notwithstanding the reporting requirements outlined above, any Reportable Event that involves only a probable violation of section 1877 of the Social Security Act, 42 U.S.C. §1395nn (the Stark Law) should be submitted by Grace to the Centers for Medicare & Medicaid Services (CMS) through the self-referral disclosure protocol (SRDP), with a copy to the OIG. The requirements of Section III.H.2 that require repayment to the payor of any identified Overpayment within 60 days shall not apply to any Overpayment that may result from a probable violation of only the Stark Law that is disclosed to CMS pursuant to the SRDP.

## IV. <u>CHANGES TO BUSINESS UNITS OR LOCATIONS</u>

### A. <u>Change or Closure of Unit or Location</u>

In the event that, after the Effective Date, Grace changes locations or closes a business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, Grace shall notify OIG of this fact as soon as possible, but no later than within 30 days after the date of change or closure of the location.

B. Purchase or Establishment of New Unit or Location

In the event that, after the Effective Date, Grace purchases or establishes a new business unit or location related to the furnishing of items or services that may be reimbursed by Federal health care programs, Grace shall notify OIG at least 30 days prior to such purchase or the operation of the new business unit or location. This notification shall include the address of the new business unit or location, phone number, fax number, the location's Medicare and state Medicaid program provider number and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which Grace currently submits claims. Each new business unit or location and all Covered Persons at each new business unit or location shall be subject to the applicable requirements of this CIA.

C. Sale of Unit or Location

In the event that, after the Effective Date, Grace proposes to sell any or all of its business units or locations that are subject to this CIA, Grace shall notify OIG of the proposed sale at least 30 days prior to the sale of such business unit or location. This notification shall include a description of the business unit or location to be sold, a brief description of the terms of the sale, and the name and contact information of the prospective purchaser. This CIA shall be binding on the purchaser of such business unit or location, unless otherwise determined and agreed to in writing by the OIG.

## V. IMPLEMENTATION AND ANNUAL REPORTS

A. Implementation Report

Within 120 days after the Effective Date, Grace shall submit a written report to OIG summarizing the status of its implementation of the requirements of this CIA (Implementation Report). The Implementation Report shall, at a minimum, include:

1. the name, address, phone number, and position description of the Compliance Officer required by Section III.A, and a summary of other noncompliance job responsibilities the Compliance Officer may have;

2. the names and positions of the members of the Compliance Committee required by Section III.A;

3. a copy of Grace's Code of Conduct required by Section III.B.1;

4. the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be available to OIG upon request);

5. a summary of all Policies and Procedures required by Section III.B (copies of the Policies and Procedures shall be made available to OIG upon request);

6. the following information regarding each type of training required by Section III.C:

a. a description of such training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions; and

b. the number of individuals required to be trained, percentage of individuals actually trained, and an explanation of any exceptions.

A copy of all training materials and the documentation supporting this information shall be made available to OIG upon request.

7. a description of the Disclosure Program required by Section III.E;

8. the following information regarding the IRO(s): (a) identity, address, and phone number; (b) a copy of the engagement letter; (c) information to demonstrate that the IRO has the qualifications outlined in Appendix A to this CIA; (d) a summary and description of any and all current and prior engagements and agreements between Grace and the IRO; and (e) a certification from the IRO regarding its professional independence and objectivity with respect to Grace;

9. a description of the process by which Grace fulfills the requirements of Section III.F regarding Ineligible Persons;

10. a list of all of Grace's locations (including locations and mailing addresses); the corresponding name under which each location is doing business; the

corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which Grace currently submits claims;

11. a description of Grace's corporate structure, including identification of individual owners, any parent and sister companies, subsidiaries, and their respective lines of business; and

12. the certifications required by Section V.C.

B. Annual Reports

Grace shall submit to OIG annually a report with respect to the status of, and findings regarding, Grace's compliance activities for each of the five Reporting Periods (Annual Report). Each Annual Report shall include, at a minimum:

1. any change in the identity, position description, or other noncompliance job responsibilities of the Compliance Officer and any change in the membership of the Compliance Committee described in Section III.A;

2. a summary of any changes or amendments to Grace's Code of Conduct required by Section III.B.1 and the reason for such changes, along with a copy of the revised Code of Conduct;

3. the Board resolution required by Section III.A.3;

4. a summary of any changes or amendments to Grace's Code of Conduct required by Section III.B.1 and the reason for such changes, along with a copy of the revised Code of Conduct;

5. the number of individuals required to complete the Code of Conduct certification required by Section III.B.1, the percentage of individuals who have completed such certification, and an explanation of any exceptions (the documentation supporting this information shall be made available to OIG upon request);

6. a summary of any significant changes or amendments to the Policies and Procedures required by Section III.B and the reasons for such changes (e.g., change in contractor policy);

7. the following information regarding each type of training required by Section III.C:

a. a description of the initial and annual training, including a summary of the topics covered, the length of sessions, and a schedule of training sessions; and

b. the number of individuals required to complete the initial and annual training, the percentage of individuals who actually completed the initial and annual training, and an explanation of any exceptions.

A copy of all training materials and the documentation to support this information shall be made available to OIG upon request.

8. a complete copy of all reports prepared pursuant to Section III.D, along with a copy of the IRO's engagement letter;

9. Grace's response to the reports prepared pursuant to Section III.D, along with corrective action plan(s) related to any issues raised by the reports;

10. a summary and description of any and all current and prior engagements and agreements between Grace and the IRO (if different from what was submitted as part of the Implementation Report);

11. a certification from the IRO regarding its professional independence and objectivity with respect to Grace;

12. a summary of Reportable Events (as defined in Section III.I) identified during the Reporting Period and the status of any corrective action relating to all such Reportable Events;

13. a report of the aggregate Overpayments that have been returned to the Federal health care programs. Overpayment amounts shall be broken down into the following categories: inresident Medicare, outresident Medicare, Medicaid (report each applicable state separately, if applicable), and other Federal health care programs. Overpayment amounts that are routinely reconciled or adjusted pursuant to policies and

procedures established by the payor do not need to be included in this aggregate Overpayment report;

14. a summary of the disclosures in the disclosure log required by Section III.E that relate to Federal health care programs (the complete disclosure log shall be made available to OIG upon request);

15. any changes to the process by which Grace fulfills the requirements of Section III.F regarding Ineligible Persons;

16. a summary describing any ongoing investigation or legal proceeding required to have been reported pursuant to Section III.G. The summary shall include a description of the allegation, the identity of the investigating or prosecuting agency, and the status of such investigation or legal proceeding;

17. a description of all changes to the most recently provided list of Grace's locations (including addresses) as required by Section V.A.12; the corresponding name under which each location is doing business; the corresponding phone numbers and fax numbers; each location's Medicare and state Medicaid program provider number(s) and/or supplier number(s); and the name and address of each Medicare and state Medicaid program contractor to which Grace currently submits claims; and

18. the certifications required by Section V.C.

The first Annual Report shall be received by OIG no later than 60 days after the end of the first Reporting Period. Subsequent Annual Reports shall be received by OIG no later than the anniversary date of the due date of the first Annual Report.

C. Certifications

The Implementation Report and each Annual Report shall include a certification by the Compliance Officer that:

1. to the best of his or her knowledge, except as otherwise described in the report, Grace is in compliance with all of the requirements of this CIA;

2. he or she has reviewed the report and has made reasonable inquiry regarding its content and believes that the information in the report is accurate and truthful; and

3. to the best of his or her knowledge, Grace has complied with its obligations under the Settlement Agreement: (a) not to resubmit to any Federal health care program payors any previously denied claims related to the Covered Conduct addressed in the Settlement Agreement, and not to appeal any such denials of claims; (b) not to charge to or otherwise seek payment from federal or state payors for unallowable costs (as defined in the Settlement Agreement); and (c) to identify and adjust any past charges or claims for unallowable costs.

D. Designation of Information

Grace shall clearly identify any portions of its submissions that it believes are trade secrets, or information that is commercial or financial and privileged or confidential, and therefore potentially exempt from disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Grace shall refrain from identifying any information as exempt from disclosure if that information does not meet the criteria for exemption from disclosure under FOIA.

## VI. NOTIFICATIONS AND SUBMISSION OF REPORTS

Unless otherwise stated in writing after the Effective Date, all notifications and reports required under this CIA shall be submitted to the following entities:

OIG:
Administrative and Civil Remedies Branch
Office of Counsel to the Inspector General
Office of Inspector General
U.S. Department of Health and Human Services
Cohen Building, Room 5527
330 Independence Avenue, S.W.
Washington, DC 20201
Telephone: 202.619.2078
Facsimile: 202.205.0604

Grace:

Dan Koliadko
7201 Shallowford Road, Suite 200
Chattanooga, TN 37421
Telephone: 423.308.1830
Facsimile: 423.308.1844

Unless otherwise specified, all notifications and reports required by this CIA may be made by certified mail, overnight mail, hand delivery, or other means, provided that there is proof that such notification was received. For purposes of this requirement, internal facsimile confirmation sheets do not constitute proof of receipt. Upon request by OIG, Grace may be required to provide OIG with an electronic copy of each notification or report required by this CIA in searchable portable document format (pdf), in addition to a paper copy.

## VII. OIG INSPECTION, AUDIT, AND REVIEW RIGHTS

In addition to any other rights OIG may have by statute, regulation, or contract, OIG or its duly authorized representative(s) may examine or request copies of Grace's books, records, and other documents and supporting materials and/or conduct on-site reviews of any of Grace's locations for the purpose of verifying and evaluating: (a) Grace's compliance with the terms of this CIA; and (b) Grace's compliance with the requirements of the Federal health care programs. The documentation described above shall be made available by Grace to OIG or its duly authorized representative(s) at all reasonable times for inspection, audit, or reproduction. Furthermore, for purposes of this provision, OIG or its duly authorized representative(s) may interview any of Grace's employees, contractors, or agents who consent to be interviewed at the individual's place of business during normal business hours or at such other place and time as may be mutually agreed upon between the individual and OIG. Grace shall assist OIG or its duly authorized representative(s) in contacting and arranging interviews with such individuals upon OIG's request. Grace's employees may elect to be interviewed with or without a representative of Grace present.

## VIII. DOCUMENT AND RECORD RETENTION

Grace shall maintain for inspection all documents and records relating to reimbursement from the Federal health care programs and to compliance with this CIA for six years (or longer if otherwise required by law) from the Effective Date.

## IX. DISCLOSURES

Consistent with HHS's FOIA procedures, set forth in 45 C.F.R. Part 5, OIG shall make a reasonable effort to notify Grace prior to any release by OIG of information submitted by Grace pursuant to its obligations under this CIA and identified upon submission by Grace as trade secrets, or information that is commercial or financial and privileged or confidential, under the FOIA rules. With respect to such releases, Grace shall have the rights set forth at 45 C.F.R. § 5.65(d).

## X. BREACH AND DEFAULT PROVISIONS

Grace is expected to fully and timely comply with all of its CIA obligations.

### A. Stipulated Penalties for Failure to Comply with Certain Obligations

As a contractual remedy, Grace and OIG hereby agree that failure to comply with certain obligations as set forth in this CIA may lead to the imposition of the following monetary penalties (hereinafter referred to as "Stipulated Penalties") in accordance with the following provisions.

1. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Grace fails to establish and implement any of the following obligations as described in Section III:

   a. a Compliance Officer;

   b. a Compliance Committee;

   c. the Board compliance obligations;

   d. a written Code of Conduct;

e. written Policies and Procedures;

f. the training of Covered Persons, Relevant Covered Persons, and Board of Directors;

g. a Disclosure Program;

h. Ineligible Persons screening and removal requirements;

i. notification of Government investigations or legal proceedings; and

j. reporting of Reportable Events.

2. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Grace fails to engage and use an IRO, as required in Section III.D, Appendix A, Appendix B, and Appendix C.

3. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Grace fails to submit the Implementation Report or any Annual Reports to OIG in accordance with the requirements of Section V by the deadlines for submission.

4. A Stipulated Penalty of $2,500 (which shall begin to accrue on the day after the date the obligation became due) for each day Grace fails to submit any MDS Review Report, Therapy Systems Assessment Report, Unallowable Cost Review Report, or response to any Therapy Systems Assessment Report in accordance with the requirements of Section III.D, Appendix B, and Appendix C.

5. A Stipulated Penalty of $1,500 for each day Grace fails to grant access as required in Section VII. (This Stipulated Penalty shall begin to accrue on the date Grace fails to grant access.)

6. A Stipulated Penalty of $5,000 for each false certification submitted by or on behalf of Grace as part of its Implementation Report, Annual Report, additional documentation to a report (as requested by the OIG), or otherwise required by this CIA.

7. A Stipulated Penalty of $1,000 for each day Grace fails to comply fully and adequately with any obligation of this CIA. OIG shall provide notice to Grace stating the specific grounds for its determination that Grace has failed to comply fully and adequately with the CIA obligation(s) at issue and steps Grace shall take to comply with the CIA. (This Stipulated Penalty shall begin to accrue 10 days after Grace receives this notice from OIG of the failure to comply.) A Stipulated Penalty as described in this Subsection shall not be demanded for any violation for which OIG has sought a Stipulated Penalty under Subsections 1- 6 of this Section.

B. Timely Written Requests for Extensions

Grace may, in advance of the due date, submit a timely written request for an extension of time to perform any act or file any notification or report required by this CIA. Notwithstanding any other provision in this Section, if OIG grants the timely written request with respect to an act, notification, or report, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until one day after Grace fails to meet the revised deadline set by OIG. Notwithstanding any other provision in this Section, if OIG denies such a timely written request, Stipulated Penalties for failure to perform the act or file the notification or report shall not begin to accrue until three business days after Grace receives OIG's written denial of such request or the original due date, whichever is later. A "timely written request" is defined as a request in writing received by OIG at least five business days prior to the date by which any act is due to be performed or any notification or report is due to be filed.

C. Payment of Stipulated Penalties

1. *Demand Letter*. Upon a finding that Grace has failed to comply with any of the obligations described in Section X.A and after determining that Stipulated Penalties are appropriate, OIG shall notify Grace of: (a) Grace's failure to comply; and (b) OIG's exercise of its contractual right to demand payment of the Stipulated Penalties. (This notification shall be referred to as the "Demand Letter.")

2. *Response to Demand Letter*. Within 10 days after the receipt of the Demand Letter, Grace shall either: (a) cure the breach to OIG's satisfaction and pay the applicable Stipulated Penalties or (b) request a hearing before an HHS administrative law judge (ALJ) to dispute OIG's determination of noncompliance, pursuant to the agreed upon provisions set forth below in Section X.E. In the event Grace elects to request an ALJ hearing, the Stipulated Penalties shall continue to accrue until Grace cures, to OIG's

satisfaction, the alleged breach in dispute. Failure to respond to the Demand Letter in one of these two manners within the allowed time period shall be considered a material breach of this CIA and shall be grounds for exclusion under Section X.D.

3. *Form of Payment*. Payment of the Stipulated Penalties shall be made by electronic funds transfer to an account specified by OIG in the Demand Letter.

4. *Independence from Material Breach Determination*. Except as set forth in Section X.D.1.c, these provisions for payment of Stipulated Penalties shall not affect or otherwise set a standard for OIG's decision that Grace has materially breached this CIA, which decision shall be made at OIG's discretion and shall be governed by the provisions in Section X.D, below.

D. Exclusion for Material Breach of this CIA

1. *Definition of Material Breach*. A material breach of this CIA means:

a. a repeated or flagrant violation of the obligations under this CIA, including, but not limited to, the obligations addressed in Section X.A;

b. a failure by Grace to report a Reportable Event, take corrective action, and make the appropriate refunds, as required in Section III.I;

c. a failure to respond to a Demand Letter concerning the payment of Stipulated Penalties in accordance with Section X.C; or

d. a failure to engage and use an IRO in accordance with Section III.D, Appendix A, and Appendix B.

2. *Notice of Material Breach and Intent to Exclude*. The parties agree that a material breach of this CIA by Grace constitutes an independent basis for Grace's exclusion from participation in the Federal health care programs. Upon a determination by OIG that Grace has materially breached this CIA and that exclusion is the appropriate remedy, OIG shall notify Grace of: (a) Grace's material breach; and (b) OIG's intent to

exercise its contractual right to impose exclusion. (This notification shall be referred to as the "Notice of Material Breach and Intent to Exclude.")

3. *Opportunity to Cure*. Grace shall have 30 days from the date of receipt of the Notice of Material Breach and Intent to Exclude to demonstrate to OIG's satisfaction that:

a. Grace is in compliance with the obligations of the CIA cited by OIG as being the basis for the material breach;

b. the alleged material breach has been cured; or

c. the alleged material breach cannot be cured within the 30 day period, but that: (i) Grace has begun to take action to cure the material breach; (ii) Grace is pursuing such action with due diligence; and (iii) Grace has provided to OIG a reasonable timetable for curing the material breach.

4. *Exclusion Letter*. If, at the conclusion of the 30 day period, Grace fails to satisfy the requirements of Section X.D.3, OIG may exclude Grace from participation in the Federal health care programs. OIG shall notify Grace in writing of its determination to exclude Grace. (This letter shall be referred to as the "Exclusion Letter.") Subject to the Dispute Resolution provisions in Section X.E, below, the exclusion shall go into effect 30 days after the date of Grace's receipt of the Exclusion Letter. The exclusion shall have national effect. Reinstatement to program participation is not automatic. After the end of the period of exclusion, Grace may apply for reinstatement by submitting a written request for reinstatement in accordance with the provisions at 42 C.F.R. §§ 1001.3001-.3004.

E. <u>Dispute Resolution</u>

1. *Review Rights*. Upon OIG's delivery to Grace of its Demand Letter or of its Exclusion Letter, and as an agreed-upon contractual remedy for the resolution of disputes arising under this CIA, Grace shall be afforded certain review rights comparable to the ones that are provided in 42 U.S.C. § 1320a-7(f) and 42 C.F.R. Part 1005 as if they applied to the Stipulated Penalties or exclusion sought pursuant to this CIA. Specifically, OIG's determination to demand payment of Stipulated Penalties or to seek exclusion shall be subject to review by an HHS ALJ and, in the event of an appeal, the HHS

Departmental Appeals Board (DAB), in a manner consistent with the provisions in 42 C.F.R. § 1005.2-1005.21. Notwithstanding the language in 42 C.F.R. § 1005.2(c), the request for a hearing involving Stipulated Penalties shall be made within 10 days after receipt of the Demand Letter and the request for a hearing involving exclusion shall be made within 25 days after receipt of the Exclusion Letter.

2. *Stipulated Penalties Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for Stipulated Penalties under this CIA shall be: (a) whether Grace was in full and timely compliance with the obligations of this CIA for which OIG demands payment; and (b) the period of noncompliance. Grace shall have the burden of proving its full and timely compliance and the steps taken to cure the noncompliance, if any. OIG shall not have the right to appeal to the DAB an adverse ALJ decision related to Stipulated Penalties. If the ALJ agrees with OIG with regard to a finding of a breach of this CIA and orders Grace to pay Stipulated Penalties, such Stipulated Penalties shall become due and payable 20 days after the ALJ issues such a decision unless Grace requests review of the ALJ decision by the DAB. If the ALJ decision is properly appealed to the DAB and the DAB upholds the determination of OIG, the Stipulated Penalties shall become due and payable 20 days after the DAB issues its decision.

3. *Exclusion Review*. Notwithstanding any provision of Title 42 of the United States Code or Title 42 of the Code of Federal Regulations, the only issues in a proceeding for exclusion based on a material breach of this CIA shall be:

a. whether Grace was in material breach of this CIA;

b. whether such breach was continuing on the date of the Exclusion Letter; and

c. whether the alleged material breach could not have been cured within the 30-day period, but that: (i) Grace had begun to take action to cure the material breach within that period; (ii) Grace has pursued and is pursuing such action with due diligence; and (iii) Grace provided to OIG within that period a reasonable timetable for curing the material breach and Grace has followed the timetable.

For purposes of the exclusion herein, exclusion shall take effect only after an ALJ decision favorable to OIG, or, if the ALJ rules for Grace, only after a DAB decision in favor of OIG. Grace's election of its contractual right to appeal to the DAB shall not abrogate OIG's authority to exclude Grace upon the issuance of an ALJ's decision in favor of OIG. If the ALJ sustains the determination of OIG and determines that exclusion is authorized, such exclusion shall take effect 20 days after the ALJ issues such a decision, notwithstanding that Grace may request review of the ALJ decision by the DAB. If the DAB finds in favor of OIG after an ALJ decision adverse to OIG, the exclusion shall take effect 20 days after the DAB decision. Grace shall waive its right to any notice of such an exclusion if a decision upholding the exclusion is rendered by the ALJ or DAB. If the DAB finds in favor of Grace, Grace shall be reinstated effective on the date of the original exclusion.

4. *Finality of Decision.* The review by an ALJ or DAB provided for above shall not be considered to be an appeal right arising under any statutes or regulations. Consequently, the parties to this CIA agree that the DAB's decision (or the ALJ's decision if not appealed) shall be considered final for all purposes under this CIA.

## XI. EFFECTIVE AND BINDING AGREEMENT

Grace and OIG agree as follows:

A. This CIA shall be binding on the successors, assigns, and transferees of Grace.

B. This CIA shall become final and binding on the date the final signature is obtained on the CIA.

C. This CIA constitutes the complete agreement between the parties and may not be amended except by written consent of the parties to this CIA.

D. OIG may agree to a suspension of Grace's obligations under this CIA based on a certification by Grace that it is no longer providing health care items or services that will be billed to any Federal health care program and that it does not have any ownership or control interest, as defined in 42 U.S.C. §1320a-3, in any entity that bills any Federal health care program. If Grace is relieved of its CIA obligations, Grace will be required to notify OIG in writing at least 30 days in advance if Grace plans to resume providing health care items or services that are billed to any Federal health care program or to

obtain an ownership or control interest in any entity that bills any Federal health care program. At such time, OIG shall evaluate whether the CIA will be reactivated or modified.

E. The undersigned Grace signatories represent and warrant that they are authorized to execute this CIA. The undersigned OIG signatory represents that he is signing this CIA in his official capacity and that he is authorized to execute this CIA.

F. This CIA may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same CIA. Facsimiles of signatures shall constitute acceptable, binding signatures for purposes of this CIA.

**ON BEHALF OF GRACE**

**GRACE HEALTHCARE, LLC**

/Stan Burton/ 2/26/13

STAN BURTON DATE
Chief Executive Officer

/Richard C. Rose/ 2/26/13

ROGER W. DICKSON DATE
RICHARD C. ROSE
Miller & Martin PLLC
Counsel for Grace Healthcare, LLC

**GRACE ANCILLARY SERVICES, LLC**

/Craig Taylor/ 2/26/13

CRAIG TAYLOR DATE
Secretary

/Richard C. Rose/ 2/26/13

ROGER W. DICKSON DATE
RICHARD C. ROSE
Miller & Martin PLLC
Counsel for Grace Ancillary Services, LLC

**ON BEHALF OF THE OFFICE OF INSPECTOR GENERAL
OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

| | |
|---|---|
| /Robert K. DeConti/ | 3/413 |
| ROBERT K. DECONTI<br>Assistant Inspector General for Legal Affairs<br>Office of Inspector General<br>U. S. Department of Health and Human Services | DATE |

| | |
|---|---|
| /Tonya Keusseyan/ | 3/4/13 |
| TONYA KEUSSEYAN<br>Senior Counsel<br>Office of Inspector General<br>U. S. Department of Health and Human Services | DATE |

## APPENDIX A

## INDEPENDENT REVIEW ORGANIZATION(S)

This Appendix contains the requirements relating to the Independent Review Organization (IRO) required by Section III.D of the CIA.

A. IRO Engagement

1. Grace shall engage an IRO that possesses the qualifications set forth in Paragraph B, below, to perform the responsibilities in Paragraph C, below. The IRO shall conduct the review in a professionally independent and objective fashion, as set forth in Paragraph D. Within 30 days after OIG receives the information identified in Section V.A.10 of the CIA or any additional information submitted by Grace in response to a request by OIG, whichever is later, OIG will notify Grace if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Grace may continue to engage the IRO.

2. If Grace engages a new IRO during the term of the CIA, this IRO shall also meet the requirements of this Appendix. If a new IRO is engaged, Grace shall submit the information identified in Section V.A.10 of the CIA to OIG within 30 days of engagement of the IRO. Within 30 days after OIG receives this information or any additional information submitted by Grace at the request of OIG, whichever is later, OIG will notify Grace if the IRO is unacceptable. Absent notification from OIG that the IRO is unacceptable, Grace may continue to engage the IRO.

B. IRO Qualifications

The IRO shall:

1. assign individuals to conduct the Minimum Data Set (MDS) Review who have expertise in the MDS requirements, Resource Utilization Group determination, claims submission, and other requirements of the Medicare Prospective Payment System for skilled nursing facilities and in the general requirements of the Federal health care program(s) from which Grace seeks reimbursement;

2. assign individuals to design and select the MDS Review sample who are knowledgeable about the appropriate statistical sampling techniques;

3. assign individuals to conduct the coding review portions of the MDS Review who have a nationally recognized MDS or Resident Assessment Instrument certification and who have maintained this certification (e.g., completed applicable continuing education requirements);

4. assign individuals to conduct or review the Unallowable Cost Review who have expertise in the requirements relating completing and filing cost reports to Medicare and the applicable Medicaid programs.

5. assign individuals to conduct the Therapy Systems Assessment who have expertise in the Medicare requirements relating to rehabilitation therapy in skilled nursing facilities and in the general requirements of the Federal health care program(s) from which Grace seeks reimbursement.

6. have sufficient staff and resources to conduct the reviews required by the CIA on a timely basis.

C. IRO Responsibilities

The IRO shall:

1. perform each MDS Review, Therapy Systems Assessment, and Unallowable Cost Review in accordance with the specific requirements of the CIA;

2. follow all applicable Medicare rules and reimbursement guidelines in making assessments in the MDS Review;

3. if in doubt of the application of a particular Medicare policy or regulation, request clarification from the appropriate authority (e.g., fiscal intermediary or carrier);

4. respond to all OIG inquires in a prompt, objective, and factual manner; and

5. prepare timely, clear, well-written reports that include all the information required by Section III.D of the CIA and Appendix B and Appendix C to the CIA.

D. IRO Independence and Objectivity

The IRO must perform the MDS Review, Therapy Systems Assessment, and Unallowable Cost Review in a professionally independent and objective fashion, as defined in the most recent Government Auditing Standards issued by the United States Government Accountability Office.

E. IRO Removal/Termination

1. *Provider and IRO*. If Grace terminates its IRO or if the IRO withdraws from the engagement during the term of the CIA, Grace must submit a notice explaining its reasons for termination or the reason for withdrawal to OIG no later than 30 days after termination or withdrawal. Grace must engage a new IRO in accordance with Paragraph A of this Appendix and within 60 days of termination or withdrawal of the IRO.

2. *OIG Removal of IRO*. In the event OIG has reason to believe the IRO does not possess the qualifications described in Paragraph B, is not independent and objective as set forth in Paragraph D, or has failed to carry out its responsibilities as described in Paragraph C, OIG may, at its sole discretion, require Grace to engage a new IRO in accordance with Paragraph A of this Appendix. Grace must engage a new IRO within 60 days of termination of the IRO.

Prior to requiring Grace to engage a new IRO, OIG shall notify Grace of its intent to do so and provide a written explanation of why OIG believes such a step is necessary. To resolve any concerns raised by OIG, Grace may present additional information regarding the IRO's qualifications, independence or performance of its responsibilities. OIG will attempt in good faith to resolve any differences regarding the IRO with Grace prior to requiring Grace to terminate the IRO. However, the final determination as to whether or not to require Grace to engage a new IRO shall be made at the sole discretion of OIG.

**APPENDIX B**

**MDS REVIEW**

A. <u>MDS Review</u>.

1. *Definitions*. For the purposes of the MDS Review, the following definitions shall be used:

a. <u>Overpayment</u>: The amount of money Grace has received in excess of the amount due and payable under any Federal health care program requirements.

b. <u>Paid Claim</u>: A claim submitted by Grace and for which Grace has received reimbursement from the Medicare Part A program.

c. <u>Population</u>: The Population shall be defined as all Paid Claims for the Subject Facilities during the 12-month period covered by the MDS Review

d. <u>Error Rate</u>: The Error Rate shall be the percentage of net Overpayments identified in the sample. The net Overpayments shall be calculated by subtracting all underpayments identified in the sample from all gross Overpayments identified in the sample. (Note: Any potential cost settlements or other supplemental payments should not be included in the net Overpayment calculation. Rather, only underpayments identified as part of the Discovery Sample shall be included as part of the net Overpayment calculation.)

The Error Rate is calculated by dividing the net Overpayment identified in the sample by the total dollar amount associated with the Paid Claims in the sample.

2. *Discovery Sample.* The IRO shall randomly select a sample of 60 Paid Claims from the Subject Facilities (Discovery Sample) and conduct the MDS Review (as defined below).

If the Error Rate (as defined above) for the Discovery Sample is less than 5%, no additional sampling is required, nor is the MDS Systems Review, required. (Note: The guidelines listed above do not imply that this is an acceptable error rate. Accordingly, Grace should, as appropriate, further analyze any errors identified in the Discovery Sample. Grace recognizes that OIG or other HHS component, in its discretion and as authorized by statute, regulation, or other appropriate authority may also analyze or

review Paid Claims included, or errors identified, in the Discovery Sample or any other segment of the universe.)

3. *Full Sample*. If the Discovery Sample indicates that the Error Rate is 5% or greater, the IRO shall select an additional sample of Paid Claims from each Subject Facility (Full Sample) using commonly accepted sampling methods and conduct a MDS Review on the Full Sample. The Full Sample shall be designed to: (1) estimate the actual Overpayment in the population with a 90% confidence level and with a maximum relative precision of 25% of the point estimate; and (2) conform with the Centers for Medicare and Medicaid Services' statistical sampling for overpayment estimation guidelines. For purposes of calculating the size of the Full Sample, the Discovery Sample may serve as the probe sample, if statistically appropriate. Additionally, the IRO may use the Paid Claims sampled as part of the Discovery Sample, and the corresponding findings for those Paid Claims, as part of its Full Sample, if: (1) statistically appropriate and (2) the IRO selects the Full Sample Paid Claims using the seed number generated by the Discovery Sample. OIG, in its sole discretion, may refer the findings of the Full Sample (and any related workpapers) received from Grace to the appropriate Federal health care program payor, including the Medicare contractor (e.g., carrier, fiscal intermediary, or DMERC), for appropriate follow-up by that payor.

4. *MDS Review*.

a. The IRO shall obtain all appropriate medical records, billing records, and related supporting documentation.

b. For each Paid Claim selected in the Discovery and Full Sample, the IRO shall review the Minimum Data Set (MDS) and the medical record documentation supporting the MDS. The review process shall consist of an evaluation of the MDS and verification that each MDS entry that affects the RUG code outcome for the MDS is supported by the medical record for the corresponding period of time consistent with the assessment reference date specified on the MDS.

c. The IRO shall perform an evaluation of the data on the Paid Claim and determine whether the variables that affect the RUG assignment outcome for the MDS are supported by the medical record for the corresponding time period consistent with the assessment reference date specified in the MDS. This shall include the following issues:

i. The accuracy of the MDS coding based on the documentation within the medical record.

ii. Verification of medical necessity in the medical record by verifying the presence of physician orders for the services reflected as necessary in the MDS.

iii. The accuracy of the associated Paid Claims. At a minimum, these shall be reviewed for the following:

A. Coverage Period;
B. Revenue Codes;
C. HIPPS codes (RUG categories and the modifiers for assessment type); and
D. Units of service.

d. In those cases where an incorrect MDS data point(s) has been identified, the IRO shall re-enter data from that MDS into the IRO's grouper software to verify that the correct RUG code assignment was properly assigned on the Paid Claim. If an incorrect RUG code was assigned, this shall be considered an error.

e. If there is insufficient support for an MDS data point(s) that results in a downward change in RUG assignment, the IRO shall consider the dollar difference to be an overpayment.

f. If an incorrect RUG was used, but it did not result in an overpayment, it shall be noted in the MDS Audit Report.

5. *MDS Systems Review*. If Grace's Discovery Sample identifies an Error Rate of 5% or greater in any Subject Facility, Grace's IRO shall also conduct a MDS Systems Review of that Subject Facility. The MDS Systems Review shall consist of the following:

a. a review of Grace's billing and coding systems and processes relating to claims submitted to Medicare Part A (including, but not limited to, the operation of the billing system, the process by which claims are coded, safeguards to ensure proper coding, claims submission and billing; and procedures to identify and correct inaccurate coding and billing);

b. for each claim in the Discovery Sample and Full Sample that resulted in an Overpayment, the IRO shall review the system(s) and process(es) that generated the claim and identify any problems or weaknesses that may have resulted in the identified Overpayments. The IRO shall provide its observations and recommendations on

suggested improvements to the system(s) and the process(es) that generated the claim.

6. *Other Requirements*.

a. Supporting Documentation. The IRO shall request all documentation and materials required for the MDS Review as part of the Discovery Sample or Full Sample (if applicable), and Grace shall furnish such documentation and materials to the IRO, prior to the IRO initiating its MDS Review of the Discovery Sample or Full Sample (if applicable). If the IRO accepts any supplemental documentation or materials from Grace after the IRO has completed its initial MDS Review of the Discovery Sample or Full Sample (if applicable) (Supplemental Documentation), the IRO shall identify in the MDS Review Report the Supplemental Documentation, the date the Supplemental Documentation was accepted, and the relative weight the IRO gave to the Supplemental Documentation in its review. In addition, the IRO shall include a narrative in the MDS Review Report describing the process by which the Supplemental Documentation was accepted and the IRO's reasons for accepting the Supplemental Documentation.

b. Paid Claims without Supporting Documentation. Any Paid Claim for which Grace cannot produce documentation sufficient to support the Paid Claim shall be considered an error and the total reimbursement received by Grace for such Paid Claim shall be deemed an Overpayment. Replacement sampling for Paid Claims with missing documentation is not permitted.

c. Use of First Samples Drawn. For the purposes of all samples (Discovery Sample(s) and Full Sample(s)) discussed in this Appendix, the Paid Claims selected in each first sample shall be used (i.e., it is not permissible to generate more than one list of random samples and then select one for use with the Discovery Sample or Full Sample).

B. MDS Review Report. The following information shall be included in the MDS Audit Review Report for each Discovery Sample and Full Sample (if applicable).

1. *MDS Review Methodology*.

a. MDS Audit Population. A description of the Population subject to the MDS Review.

b. MDS Review Objective. A clear statement of the objective intended to be achieved by the MDS Review.

c. Source of Data. A description of the specific documentation relied upon by the IRO when performing the MDS Review (e.g., medical records, physician orders, certificates of medical necessity, requisition forms, local medical review policies (including title and policy number), CMS program memoranda (including title and issuance number), Medicare carrier or intermediary manual or bulletins (including issue and date), other policies, regulations, or directives).

d. Review Protocol. A narrative description of how the MDS Review was conducted and what was evaluated.

e. Supplemental Documentation. A description of any Supplemental Documentation as required by A.5.a., above.

2. *Statistical Sampling Documentation*.

a. A copy of the printout of the random numbers generated by the "Random Numbers" function of the statistical sampling software used by the IRO.

b. A copy of the statistical software printout(s) estimating how many Paid Claims are to be included in the Full Sample, if applicable.

c. A description or identification of the statistical sampling software package used to select the sample and determine the Full Sample size, if applicable.

3. *MDS Review Findings*.

a. Narrative Results.

i. A description of Grace's billing and coding system(s) for submission of claims to Medicare Part A, including the identification, by position description, of the personnel involved in coding and billing.

ii. A narrative explanation of the IRO's findings and supporting rationale (including reasons for errors, patterns noted, etc.)

regarding the MDS Review, including the results of the Discovery Sample, and the results of the Full Sample (if any).

b. Quantitative Results.

i. Total number and percentage of instances in which the IRO determined that the Paid Claims submitted by Grace (Claim Submitted) differed from what should have been the correct claim (Correct Claim), regardless of the effect on the payment.

ii. Total number and percentage of instances in which the Claim Submitted differed from the Correct Claim and in which such difference resulted in an Overpayment to Grace.

iii. Total dollar amount of all Overpayments in the sample.

iv. Total dollar amount of Paid Claims included in the sample and the net Overpayment associated with the sample.

v. Error Rate in the sample.

vi. A spreadsheet of the MDS Review results that includes the following information for each Paid Claim: Federal health care program billed, beneficiary health insurance claim number, date of service, code submitted, code reimbursed, allowed amount reimbursed by payor, correct code (as determined by the IRO), correct allowed amount (as determined by the IRO), dollar difference between allowed amount reimbursed by payor and the correct allowed amount.

c. Recommendations. The IRO's report shall include any recommendations for improvements to Grace's billing and coding system based on the findings of the MDS Review

4. *MDS Systems Review*. The IRO shall prepare a report based on the MDS Systems Review (MDS Systems Review Report) that shall include the IRO's observations, findings, and recommendations regarding:

a. the strengths and weaknesses in Grace's medical record documentation, coding process, billing system, relevant policies and procedures, internal controls, or reporting mechanisms; and

b. possible improvements to Grace's medical record documentation, coding process, billing system, relevant policies and procedures, internal controls or reporting mechanisms to address the specific problems or weaknesses that resulted in the identified Overpayments.

5. *Credentials*. The names and credentials of the individuals who: (1) designed the statistical sampling procedures and the review methodology utilized for the MDS Review and (2) performed the MDS Review.

## APPENDIX C

## THERAPY SYSTEMS ASSESSMENT

A. Therapy Systems Assessment.

1. For each Reporting Period, the IRO shall assess the effectiveness, reliability, and thoroughness of Grace's rehabilitative therapy systems at the Subject Facilities and Grace Healthcare's oversight of its therapy contractors, including Grace Ancillary Services. The systems assessment shall include, but is not limited to, ensuring the contractor:

a. provides only skilled rehabilitation therapy that is: (1) pursuant to an individualized plan of care; (2) consistent with the nature and severity of the resident's individual illness or injury; (3) in compliance with accepted standards of medical practice; (4) be reasonable and necessary given the resident's condition and plan of care to improve, maintain, or slow deterioration of the resident's condition; and (5) only include services that are inherently complex and require the skills of physical, speech, or occupational therapists, among other types of professionals;

b. complies with Medicare program requirements relating to the tracking of therapy minutes (e.g., only includes services that are inherently complex and require the skills of physical, speech, or occupational therapists, among other types of professionals; appropriately accounts for group and concurrent therapy);

c. complies with all Medicare and Grace requirements relating to the documentation of medical records;

d. obtains an assessment, by a physician, of the resident's need for skilled therapy and that the skilled services will improve, maintain or slow deterioration of the resident's condition; and

e. receives appropriate and effective training that, at a minimum, includes the subject matters set forth in Section III.C.2.b of the CIA.

2. If, at any time during the term of the CIA, Grace no longer contracts for the provision of therapy services to its residents and, instead, provides therapy services through its own employees or other arrangement, the IRO shall assess the effectiveness, reliability, and thoroughness of Grace's oversight of those therapy services, including, but not limited to, the areas described in Section A.1.

3. In conducting the Therapy Systems Assessments, the IRO shall, at a minimum, review policies and procedures, medical records, and other therapy-related documentation, observe the provision of therapy services at Grace, observe therapy-related care planning meetings, and interview key employees and contractors. Grace shall take all necessary steps to ensure the IRO has access to Grace's facilities, documents, employees, and contractors to perform the activities set forth in this Section A.3 in a legally and clinically appropriate manner.

B. Therapy Systems Assessment Report.

1. The IRO shall submit a written report to Grace and OIG (hereinafter the "Therapy Systems Assessment Report") that sets forth, at a minimum:

a. A summary of the IRO's activities in conducting the Therapy Systems Assessment;

b. The IRO's findings regarding the effectiveness, reliability, and thoroughness of the oversight described in Section A.1;

c. The IRO's recommendations to Grace as to how to improve the effectiveness, reliability, and thoroughness of the oversight described in Section A.1; and

d. The IRO's assessment of Grace's response to the IRO's recommendations in the prior Therapy Systems Assessment Reports (this does not need to be included in the Therapy Systems Assessment Report for the first Reporting Period).

e. The names and credentials of the individuals who performed the Therapy Systems Assessment.

2. The IRO shall submit each Therapy Systems Assessment Report to Grace and OIG no later than 30 days after the end of each Reporting Period.

C. Grace's Response to the IRO's Therapy System Assessment Report. Within 30 days after receipt of each IRO Therapy Systems Assessment Report, Grace shall submit to OIG and the IRO a written response to each recommendation contained in the Therapy Systems Assessment Report stating what action Grace took in response to each recommendation or why Grace has not elected to take action based on the recommendation.